STATE of Minnesota, Respondent,

v.

David Aaron DAY, Appellant.

No. C6–99–1568.

Supreme Court of Minnesota.

Dec. 14, 2000.

John M. Stuart, State Public Defender, Michael F. Cromett, Assistant State Public Defender, Minneapolis, for appellant.

Mike Hatch, State Attorney General, John B. Galus, Assistant Attorney General, St. Paul, Gregory D. Larson, Hubbard County Attorney, Park Rapids, for respondent.

## OPINION

PAGE, Justice.

Following a jury trial in Hubbard County District Court, appellant David Aaron Day was found guilty of first-degree murder while committing first-degree criminal sexual conduct under Minn.Stat. § 609.185(2) (1998), first-degree murder while committing aggravated robbery under Minn.Stat. § 609.185(3) (1998), and second-degree intentional murder under Minn.Stat. § 609.19, subd. 1(1) (1998), for the May 14, 1998, killing of Carol Ann Kirchner. Day was sentenced to life imprisonment without possibility of release. Before trial, Day moved to suppress a statement he gave to Bureau of Criminal Apprehension (BCA) agents during a custodial interrogation on May 14, 1998. He argued that the statement was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That motion was denied.

In this direct appeal, Day again challenges the admissibility of his May 14, 1998, custodial statement. In addition, he argues that the trial court erred by admitting evidence about Carol Kirchner's life in the form of testimony by her husband, David Kirchner, and four photographs of her while she was alive, which he claims appealed to the sympathy, prejudice, and passions of the jury. Finally, Day claims that he was denied due process and a fair trial by erroneous evidentiary rulings, prosecutorial misconduct during closing argument, and the denial of two mistrial motions. We affirm.

The facts giving rise to Day's conviction are as follows. Day spent the night of May 13, 1998, socializing, drinking, and driving to various locations in and around Bemidji and Cass Lake with his friend Derwin Lovelace, his cousins Stephanie Littlewolf and Teri Littlewolf, and Teri's boyfriend, Hershel Crowghost. At some point, Day and Lovelace stole two rifles from a friend of Day's and put them in the trunk of Day's car. Near daylight on May 14, while driving on South Big Wolf Lake Road to Lovelace's uncle's house, Day lost control and drove the car into a ditch.

As the group worked to free the car from the ditch, Carol Kirchner, who lived at a nearby resort, passed by on her morning walk. Shortly after she went by, Day and Lovelace set out on foot in the same direction as Kirchner. Lovelace went to his uncle's house, borrowed a car, and returned. Meanwhile, a man in a pickup truck drove by and pulled Day's car from the ditch. Although Day had not returned, Lovelace, Crowghost, and the Littlewolf sisters drove to Lovelace's uncle's house. Day arrived at the house sometime later wearing wet shoes and pants. He was also wearing what turned out to be Carol Kirchner's wedding rings on his right pinkie finger. According to Lovelace, when he asked Day where Day got

the rings, Day responded, "From that bitch that I left in the woods."

David Kirchner became concerned when Carol Kirchner failed to return from her walk. With help from a neighbor, he went looking for her and found her body shortly after 9:15 a.m. that morning. She was lying on her back in a swampy area near South Big Wolf Lake Road. Her jacket, blouse, and bra were pushed up exposing her breasts, and she was naked from the waist down with her legs spread apart.

The police arrested Day a little after noon on May 14 and transported him to the Hubbard County Law Enforcement Center, where he was placed in an interview room. During the drive to the law enforcement center, Day asked the officer transporting him for a lawyer. The officer responded that Day would "get a lawyer when [he] got to the jail." At 3:15 p.m. that afternoon, BCA Special Agents David Bjerga and Daniel Ahlquist went to the interview room to conduct a taped interview with Day. Day initially mistook the agents for public defenders.[1] Meanwhile, the agents discovered that Day had urinated on the floor, which they proceeded to clean. After identifying themselves as BCA agents, the following colloquy took place:

DA[2]: I'm gonna read you your rights. You have the right to remain silent. *Anything you say can and will be used against you in a court of law.* You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish. Do you understand each of these rights as explained to you?

DD: Yes.

DA: Having those rights in mind, do you wish to talk to us now?

DD: [CLEARS THROAT]

DA: Or at least here [sic] what we have to say?

DD: Um hmm. [AFFIRMATIVE RESPONSE]

DA: Okay.

DB: First of all we need to clear that up. You, you'll listen to what we have to say and maybe answer some of our questions, is that right?

DD: Yeah. I'm, I'm pretty [INAUDIBLE]

DB: We what?

DD: *Said I don't want to tell you guys anything to say about me in court.*

DA: Well, we won't say anything that isn't you know, what, what you tell us, you know.

DB: But I guess it's just real important that you know that you understand your rights and at this time you'll still talk to us. That's what we need to know.

DD: Well, to the best of my ability, from what I understand that, yeah, I will.

(Emphasis added.)

Bjerga and Ahlquist then questioned Day for approximately an hour. Day initially denied any involvement with a stuck car on South Big Wolf Lake Road or knowing anything about a woman walking that road.[3] He later admitted that he was at the stuck car and that a woman walked by, but claimed that he did not pay any attention to her. According to Day, he left the car to go to Lovelace's uncle's house. At first, Day denied speaking to the woman, but later admitted that he had talked

---

1. Day does not claim that his May 14 custodial statement should have been suppressed because he invoked his right to counsel and that issue is not before us.

2. "DD" refers to Day; "DA" refers to Agent Ahlquist; "DB" refers to Agent Bjerga.

3. Although Agent Bjerga testified at trial that Day initially denied knowing anything about a woman walking along South Big Wolf Lake Road, the transcript from the May 14 custodial interrogation does not reflect that Day made such a statement. Day has never contended, however, that Agent Bjerga's testimony was inaccurate.

with her. He also stated that he ran ahead of the woman, but returned when he heard her choking or coughing and attempted to give her the Heimlich maneuver. He claimed he then left her alongside the road. Day said he changed his shoes and pants at Lovelace's uncle's house and that the shoes were either in the trunk of his car or at the house. He denied having any sexual contact with the woman and stated that DNA evidence would not link him to her. Day cried during the last half of the interview.

The interview ended when Day slid off his chair onto the floor and refused to respond to further questions. Bjerga and Ahlquist attempted to interview Day a second time approximately two and one-half hours later, but Day asked for an attorney and the interview was terminated.

At a pretrial hearing, Day sought to have his May 14, 1998, statement to Bjerga and Ahlquist suppressed, claiming that they ignored his invocation of his right to remain silent and that he did not make a knowing, intelligent, and voluntary waiver of his right to remain silent. Day claimed that he invoked his right to remain silent during the interrogation when he stated, "Said I don't want to tell you guys anything to say about me in court." The trial court denied Day's motion, finding that Day's statement was ambiguous and equivocal and therefore not an invocation of his right to remain silent. The trial court further found that Day's waiver of his right to remain silent was knowing, intelligent, and voluntary.

Evidence at trial established that Carol Kirchner died from asphyxia due to fractures of the hyoid bone and thyroid cartilage in her neck as a result of being stomped. Death occurred instantaneously or, at most, within a matter of minutes. Kirchner also suffered seven fractured ribs, had abrasions on her back consistent with having been dragged across a rough surface, and her genitalia were injured. Her hands and the right side of her face were bruised and there were herringbone patterns on the left side of her face that

appeared to be footwear impressions. Expert testimony at trial indicated that the shoes Day was wearing on the morning of May 14, 1998, could have produced the footwear impressions found on Kirchner's face. The evidence also established that Carol Kirchner had been sexually assaulted. In addition to evidence of injury to her genitalia, vaginal swabs taken from her body tested positive for sperm. DNA tests performed on the vaginal swabs and on blood samples from Day, Lovelace, and Crowghost eliminated Lovelace and Crowghost as possible sources of the sperm, and pointed to Day as the only likely source.

Day testified at trial in his own defense. According to Day, after Carol Kirchner walked by, he told Lovelace he thought she had seen the stolen rifles in the trunk of his car. He then jogged down the road and spoke to her, with Lovelace just a few steps behind. He testified that Kirchner said something about not drinking and driving and about guns in the trunk and that Lovelace "snapped," grabbed her by the throat, and pushed her down onto her back and fell on her with his knees. Day asked Lovelace what he was doing and Lovelace responded, "Fuck this little 'ho." Day claimed that he became scared and ran away. He testified that he glanced back while running away and saw Lovelace on top of Carol Kirchner with her legs kicking in the air. According to Day, he sat listening in the woods for 20 minutes and emerged when he thought he heard someone calling him. He testified that he was returning to the car when he saw scuff marks in the sand along the road and a trail of matted grass. He followed the trail to Carol Kirchner's body, which was lying in the weeds, naked from the breastline down and apparently unconscious. Upon seeing Kirchner's body, he became sexually excited and had sex with her, but claimed that he did not notice that she was not breathing until after the sex act was over. When he realized she was not breathing, he tried to resuscitate her using CPR and the Heimlich maneuver. He denied stomping her face and neck or break-

ing any of her ribs. He claimed he lied to the BCA agents on May 14, 1998, because he was afraid that if he told the truth Lovelace would retaliate against him or his family.

## I.

■ The first issue raised by Day is whether his May 14, 1998, custodial statement should have been suppressed by the trial court because BCA Agents Bjerga and Ahlquist failed to honor his invocation of his right to remain silent. We have held that an unambiguous and unequivocal invocation of the right to remain silent is required to implicate *Miranda's* protections. *See State v. Williams*, 535 N.W.2d 277, 285 (Minn.1995). Once implicated, the defendant's right to remain silent must be " 'scrupulously honored' " and the interrogation must cease. *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *see also State v. Johnson*, 463 N.W.2d 527, 532 (Minn. 1990). If the invocation of the right is ambiguous or equivocal, the interrogating officers are not required to confine their questioning to clarifying questions. *See Williams*, 535 N.W.2d at 285.

■ In *Davis v. United States*, the United States Supreme Court held that, in order to unambiguously and unequivocally invoke the *right to counsel*, a suspect must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Applying this standard in the *right to remain silent* context, the proper inquiry is whether the suspect articulated his desire to remain silent sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of the right to remain silent. *Cf. Williams*, 535 N.W.2d at 283 ("[T]he language used by the suspect must sufficiently articulate the desire to remain silent."). Thus, the question we must answer is whether Day's statement—"Said I don't want to tell you guys anything to say

about me in court"—constitutes an unambiguous and unequivocal invocation of his right to remain silent. Viewed in context, we conclude that it does. Agent Ahlquist read the *Miranda* warning to Day. When asked if he understood, Day said "Yes." Ahlquist next asked, "Having those rights in mind, do you wish to talk to us now?" Day responded by merely clearing his throat. Ahlquist then asked, "Or at least here [sic] what we have to say?" Day responded "Um hmm." In an attempt to clarify the extent to which Day was willing to cooperate, Ahlquist continued, "First of all we need to clear that up. You, you'll listen to what we have to say and maybe answer some of our questions, is that right?" Day responded, "Yeah. I'm, I'm pretty [INAUDIBLE]." Agent Bjerga then asked, "We what?" and Day responded, "Said I don't want to tell you guys anything to say about me in court."

The state makes various arguments in support of its claim that Day's statement was ambiguous and equivocal. These arguments, however, ignore logic, the facts of this case, the *Miranda* warning itself, and notions of basic fairness. The state first argues that "Said I don't want to tell you guys anything to say about me in court" could be interpreted as Day merely expressing his concern that the BCA agents would lie about him in court. This is a curious argument because the state does not elaborate on why this is a reasonable interpretation of Day's words. Because neither Day's statements nor the surrounding circumstances indicate that Day was concerned about the agents lying, some explanation is necessary. This is especially true because the interrogation was openly recorded.

Alternatively, the state contends that Day's statement, like the statement made by the defendant in *State v. Jobe*, 486 N.W.2d 407 (Minn.1992), "might have reflected his willingness to talk to the agents but only under particular conditions or about particular subjects." In *Jobe*, this court held that a suspect did not unambig-

uously invoke his right to remain silent when he said that "he did not want to discuss the night of the murders but would discuss 'lighter' subjects." *Id.* at 416. Unlike the defendant in *Jobe*, however, Day did not limit his refusal to certain subjects or state that he was willing to discuss alternative subjects. Nor did Day suggest that he would speak to the agents if some particular condition was met.

The state also compares the facts of this case to the facts in *Williams.* In *Williams*, the defendant after being interviewed for approximately one hour became angry with one of the interrogating officers, stood up from his chair, stated, " 'I don't have to take any more of your bullshit,' " and then walked out of the interrogation room. *Id.* at 281. We held that this statement was ambiguous and equivocal because the defendant never specifically stated he wanted to stop answering questions and because he never exhibited a general refusal to answer questions. *See id.* at 284.

In contrast, Day's statement, "Said I don't want to tell you guys anything to say about me in court," came almost immediately after he was read the *Miranda* warning including the statement, "Anything you say can and will be used against you in a court of law." Clearly, the first part of Day's statement, "Said I don't want to tell you guys anything," is unambiguous and unequivocal. It indicates that there is no action, event, or time that Day was willing to discuss with the BCA agents. The second part of the statement further cements the unambiguous nature of Day's refusal to discuss "anything" by adding that he refused to talk about anything that would be used against him in a court of law. To read Day's statement any other way would be perversely unfair in that it would punish him for carefully listening to the *Miranda* warning and responding in kind. We therefore hold that Day's statement constituted an unambiguous and unequivocal invocation of his right to remain silent.

In *Michigan v. Mosley*, the United States Supreme Court concluded that, although *Miranda* declared that once a suspect invokes the right to remain silent " 'the interrogation must cease,' " it does not mean that all subsequent questioning is impermissible. 423 U.S. 96, 101–03, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Instead, the Court held that the admissibility of statements made after a suspect invokes the right to remain silent depends on whether that right was " 'scrupulously honored.' " *Id.* at 104, 96 S.Ct. 321. The Court observed that the police would fail to honor a person's invocation of his right to remain silent "either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105–06, 96 S.Ct. 321; *see also id.* at 102, 96 S.Ct. 321 (the resumption of interrogation following "a momentary cessation would clearly frustrate the purposes of *Miranda* "); *State v. Johnson*, 463 N.W.2d 527, 532 (Minn.1990) ("Once a person subject to custodial interrogation asserts the right to remain silent, interrogation must cease."). Here, Agents Bjerga and Ahlquist continued to question Day after he invoked his right to remain silent and thereby failed to "scrupulously honor" that right. Accordingly, we hold that the trial court erred by not suppressing Day's May 14, 1998, custodial statement.

■■■ Having concluded that the admission of Day's statement was error, we must next answer the question, "What effect did the jury's hearing [the defendant's] statement * * * actually have on the guilty verdict rendered?" *State v. Juarez*, 572 N.W.2d 286, 292 (Minn.1997). If the verdict rendered is " 'surely unattributable' " to the error, the error is harmless beyond a reasonable doubt and the conviction stands. *Id.; see also Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). When applying harmless error analysis, we look to the record as a whole. *See Juarez*, 572 N.W.2d at 292.

■■ Day points to the admission of eight specific statements he made during

the May 14 custodial interrogation that he contends makes the error not harmless. They include: (1) his statement that he was not with the stuck car and did not see a woman walking; (2) his statement that he was with the car and saw a woman but did not pay attention to her; (3) his statement that he left the car to run to Lovelace's uncle's house; (4) his statement that he changed shoes and put the ones he took off into the trunk of his car; (5) his statement that he did not speak to the woman who walked by the stuck car, along with his subsequent statement admitting that he did speak to her; (6) his statement that DNA evidence would not link him to the woman; (7) his statement that he heard the woman choking or coughing and tried to save her by using the Heimlich maneuver; and (8) his statement that he did not have sex with the woman. Whether viewed individually or in combination, we conclude that the jury's guilty verdict was surely unattributable to the erroneous admission of these statements. Therefore, we hold that their admission, although error, was harmless beyond a reasonable doubt.

Our conclusion is based on our review of the record, which includes substantial independent evidence of the facts contained in those statements. There was testimony from everyone who was in Day's group at the time Day's car became stuck that Day was present when Carol Kirchner walked by and that, after she walked by, he left the car heading in her direction. Day and two other witnesses testified that he talked to Carol Kirchner. Three witnesses testified that Day put his wet shoes in his car's trunk and Day testified that he either put the shoes in the trunk of his car or left them at Lovelace's uncle's house. Day also testified that he had sex with Carol Kirchner and the state introduced DNA evidence implicating Day and Day alone as having had sex with her.

While there was no independent evidence regarding Day's custodial statement that he used the Heimlich maneuver on Carol Kirchner, it is unlikely that that part of his custodial statement had any meaningful effect on the jury's verdict given the DNA evidence and his testimony that he had sex with her.

There was also substantial evidence admitted at trial that was unrelated to Day's custodial statements which, if believed by the jury, implicated Day in Carol Kirchner's death. There was evidence that Day was the last person to be seen with Carol Kirchner before her death; that Day had Carol Kirchner's wedding rings when he returned to Lovelace's uncle's house; that he claimed to have gotten the rings "from that bitch that I left in the woods"; that he tried to sell the rings, first to Lovelace and later to Lovelace's cousin; and that his shoes could have been the ones that made the footwear impressions on Carol Kirchner's face. Finally, there was the DNA evidence and Day's admission that he had sex with Carol Kirchner.

## II.

█ Day next argues that the trial court erred by allowing the state to introduce excessive evidence of Carol Kirchner's past life. Specifically, he claims that David Kirchner's testimony and the admission of four photographs of Carol Kirchner, along with the prosecutor's use of one of the photographs during closing argument, was prejudicial because it appealed to the jury's passions, prejudices, and sympathy. Based on our review of the record, we conclude that this argument has no merit.

█ Day failed to object at trial to David Kirchner's testimony and the prosecutor's closing argument. Because he failed to object at trial, the issues relating to that testimony and the prosecutor's closing argument are waived. *See State v. Buggs*, 581 N.W.2d 329, 342 (Minn.1998). While we may review the issues for plain error, a thorough review of the record leads us to conclude that there was no plain error. *See State v. Griese*, 565 N.W.2d 419, 427 (Minn.1997). With respect to the admission of the photographs, we note that the inclusion of photographs is left to the sound discretion of the trial

court, which we will not reverse absent a clear abuse of that discretion. *See State v. Scales,* 518 N.W.2d 587, 593 (Minn.1994). It is important to note that in the past we have held that evidence, including photographs, showing that "[t]he victim was not just bones and sinews covered with flesh, but was imbued with the spark of life," is admissible so long as its use "is not an 'attempt to invoke any undue sympathy or inflame the jury's passions.'" *State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985). The four photographs admitted here, much like the ones admitted in *Scales,* were used to provide background information and to personalize Carol Kirchner and were not excessive. *See Scales,* 518 N.W.2d at 593. Moreover, we conclude that the four photographs were not intended to invoke undue sympathy or inflame the jury's passions. Therefore, we hold that there was no abuse of discretion in their admission.

### III.

Finally, Day claims that a number of erroneous evidentiary rulings and the denial of two mistrial motions by the trial court denied him due process and a fair trial. We see no reason to address these claims individually. We have reviewed each of the claims in light of the record and question whether any error occurred. In any event, we are satisfied, for the reasons discussed above, that if any error did occur such error was harmless beyond a reasonable doubt. *See State v. Juarez,* 572 N.W.2d 286 (Minn.1997).[4]

Affirmed.

---

[4]. Because we concluded that the admission of Day's May 14 custodial statement was error, we need not address his claim that his May 14 statement was inadmissible because he did not make a knowing, intelligent, and voluntary waiver of his right to remain silent.