**STATE of Minnesota, Respondent,**

v.

**Kevin Terrance HANNON, Appellant.**

No. C0–00–2013.

Supreme Court of Minnesota.

Dec. 20, 2001.

Rehearing Denied Jan. 14, 2002.

Leslie J. Rosenberg, Asst. State Public Defender, Minneapolis, for appellant.

James B. Early, Asst. Atty. Gen., St. Paul, Roger S. Van Heel, Stearns County Atty., St. Cloud, for respondent.

## OPINION

GILBERT, Justice.

On June 20, 2000, a jury found appellant Kevin Terrance Hannon guilty of one

count of premeditated first-degree murder, two counts of felony murder (kidnapping), one count of felony murder (arson), and one count of second-degree intentional murder. Appellant argues, among other things, that his federal and state constitutional rights were violated because the interrogating officers failed to cease the interrogation after appellant invoked his *Miranda* rights.[1] As to this issue, we must decide whether the trial court clearly erred in finding that appellant made an equivocal request for counsel when, after the interrogating officers told the appellant that they believed he had killed Deborah Tolhurst, appellant stated "Can I have a drink of water and then lock me up—I think we really should have an attorney." For the reasons stated herein, we reverse and remand for a new trial.

Around 9:00 p.m. on September 21, 1999, a security guard working at the Clearwood Park Apartments located in St. Cloud, Minnesota, noticed black smoke rolling out of a window of apartment 304. The security guard immediately notified the police department and then went into the apartment building. After arriving in front of the door of apartment 304, the security guard was able to observe smoke coming from underneath the door. He pounded on the door and yelled to see if anyone was inside the apartment but received no response. The security guard then discovered that the door was unlocked and opened the door in an attempt to enter the apartment, but was unable to enter because he was immediately overcome by the smoke.

Firefighters arrived at the scene shortly thereafter. The firefighters saw smoke and flames coming from the third floor window, proceeded to the third floor, and discovered that the hallway was filled with smoke from floor to ceiling. They moved down the hallway with a fire hose and entered apartment 304. Once in the apartment, the firefighters located the fire, which was coming out of the bedroom along the ceiling and into the living room. They proceeded to spray water at the fire and then entered the bedroom, at which point one of the firefighters noticed a body lying on the floor in the bedroom. After the fire was extinguished, firefighters and police officers determined that the badly burned body was lying face down, with the victim's arms crossed at the wrists behind the victim's back just above the belt line. The victim was ultimately identified as Deborah Tolhurst.

After the fire was put out, the police received information that appellant lived in apartment 304 with Tolhurst and began looking for him. At around 6:45 p.m. on the next day, officers arrived at the Germaine Towers in downtown St. Cloud and asked the caretaker if he recognized appellant from the picture the officers showed him. The caretaker told the officers that he believed appellant was in the apartment of one of his tenants. The officers went to this apartment and found appellant hiding in the bedroom. He was then arrested and transported to the Stearns County Law Enforcement Center.

A detective with the Stearns County Sheriff's Department and an officer with the St. Cloud Police Department began interrogating appellant immediately after

---

1. Appellant also argues that (1) his federal and state constitutional rights to a fair trial were denied because the prosecutor used a peremptory challenge to exclude the only minority person examined as a potential juror; (2) the trial court erred by allowing a convicted felon to testify that appellant had talked about how to cover up a crime; and (3) the trial court erred by not instructing the jury on the lesser-included offense of second-degree felony murder. Because we reverse and remand for a new trial on the ground that appellant was improperly denied his right to counsel, we need not decide the other issues.

his arrest. They read appellant his *Miranda* rights and he signed a document indicating that he understood these rights. The officers then began questioning appellant. One of the officers told appellant that he smelled like alcohol and asked appellant if he was drunk. Appellant admitted that he had a couple of drinks, but told the officers that he did not believe he was drunk.

He initially explained that he lived with Tolhurst and claimed that the last time he saw her was around 5:30 p.m. on September 21, 1999 in her apartment. Appellant told the officers that he arrived at Tolhurst's apartment between 9:00 and 9:30 a.m. on September 21 after working all night. He then stated that Tolhurst's brother and another man named Paul Mackey came to Tolhurst's apartment around 6:00 or 7:00 p.m. Appellant told the officers that Tolhurst told him to leave and that he then went to a bar nearby named J.D. Beamer's.

The officers then confronted appellant with information they had obtained from other people in the apartment complex about hearing appellant and Tolhurst engaged in a heated argument during the afternoon of September 21. Appellant admitted to arguing some with Tolhurst that day, but told the officers he did not remember it being a heated argument. As the officers questioned appellant, he repeatedly indicated that he did not know what the officers were talking to him about. After the officers finally told appellant that Tolhurst was dead, the following exchange took place:

Appellant: What are you saying here?

Detective: What are we saying? We're saying that you took Deb's life.

Appellant: You're saying I killed Deb?

Detective: Absolutely. There's no doubt about that. OK? We know that.

Officer: We know what happened.

Detective: We just need to know why you did that, OK? We know you did that. That's not even a question here, Kevin. Understand that? We know that. We talked to a bunch of people here and—and we—we put the evidence together at the scene and it clearly points to you. OK? So, we need to know why. What was your—?

Appellant: You think I killed her?

Detective: Did you—did you kill her because you were upset with her? Did you kill her because—

Appellant: You think I killed—

Detective: Kevin, it's not that we think that, we know that. We need to know why you did that. That's all, OK? Tha—it's no question as to did you do that. That's not a question here, Kevin, OK? So—

Appellant: *Can I have a drink of water and then lock me up—I think we really should have an attorney.*

Detective: We'll get you a drink of water.

Appellant: I don't want to talk anymore please. (Pause). This is—this is really wrong. This woman has scars all over her from this Paul Mackey. He's callin' her 50 times a week.

Detective: 'Kay. If you want to talk to an attorney, you understand that we have to stop talking to you. OK? And—and then your side of this story will never be known. That's your choice. That's a choice you're making.

Appellant: So, that means what?

Detective: That means we're gonna put this thing together and we're gonna convict you of murder.

Appellant: Of murder?

Detective: Absolutely. Yup.

Appellant: Convict me of murdering her?

(Emphasis added.) The interrogation continued and appellant made numerous statements regarding his involvement in Tolhurst's death. Specifically, appellant admitted to hitting and kicking Tolhurst multiple times, knocking Tolhurst out, putting duct tape around her legs, and lighting a paper bag on fire and throwing it on top of her while stating "You need to burn, you bitch." Appellant told the officers that he put the duct tape around Tolhurst's legs because she was kicking him. He also said that he only wanted to scare her when he lit the bag on fire and immediately patted the fire out. All of these admissions were recorded on videotape.

Appellant then gave a formal statement to the interrogating officers. He was not read his *Miranda* rights again before this statement was taken. In this formal statement, appellant again admitted to hitting and kicking Tolhurst multiple times, knocking her out, putting duct tape on her feet and mouth, and throwing a burning paper bag on her. He also admitted to grabbing Tolhurst by the throat, cutting telephone lines in Tolhurst's apartment, and throwing the white shirt he had on when he was fighting with Tolhurst into the back of a pick-up truck parked outside of J.D. Beamer's, the bar he went to after leaving Tolhurst's apartment. The majority of this formal statement was videotaped, with the end of it being audiotaped after the videotape ran out. Appellant was subsequently indicted on four counts of first-degree murder and one count of second-degree intentional murder.

On February 17, 2000, an omnibus hearing was held to consider appellant's motion to suppress the admission of all statements made after he requested an attorney and indicated that he did not want to talk anymore on the grounds that the police violated appellant's right to counsel and his right to remain silent. The trial court concluded that, "[appellant's] poorly enunciated statement, '[c]an I have a drink of water and then lock me up I think we really should have an attorney,' is, if anything, an equivocal request for an attorney." Citing *State v. Robinson*, 427 N.W.2d 217, 223 (Minn.1988), the court recognized that, since there was an equivocal request for counsel, the investigating officers were required to stop asking any more questions except those narrowly tailored to clarify appellant's true desire with respect to counsel. The court concluded that, while the detective's comment to appellant that his side of the story would never be known if he wanted to talk to an attorney was gratuitous and approached impermissible interrogation, it was still "narrowly designed to clarify [appellant's] wishes with respect to counsel." The court went on to find:

The Defendant did not indicate that he wanted an attorney at that juncture. Instead, he reinitiated the conversation by asking [the detective] a question of his own. The Court concludes that [the detective] could then respond to the Defendant's inquiries and continue on with the interrogation. The Defendant's re-initiation of the conversation, together with his choice not to respond to [the detective's] clarifying inquiry, indicate to the Court's satisfaction that the Defendant did not in fact invoke his right to counsel.

The court noted that the state admitted that appellant invoked his right to remain silent when he said, "I don't want to talk anymore please." However, the court found that appellant "voluntarily waived his right to silence when he re-initiated his conversation with the police by implicating Paul Mackey in the crime." Based on

these findings, the court denied appellant's motion.

The state presented several witnesses at trial. One of Tolhurst's neighbors in the apartment complex testified that she heard Tolhurst arguing with someone in Tolhurst's apartment between 5:30 and 6:00 p.m. on September 21. Another neighbor testified that she heard people arguing and banging noises coming from apartment 304 off and on between 6:00 and 7:30 p.m. on September 21. This witness testified that she heard "aggressive" yelling, but could not tell whose voices she heard or what was being said. One witness testified that appellant had, prior to September 21, 1999, stated that he wanted to kill Tolhurst and another witness testified that, prior to September 21, 1999, appellant had stated that Tolhurst "makes me so mad that I could kill her." Two other witnesses, both of whom were in the Stearns County jail with appellant following his arrest, testified that appellant told them he had beaten Tolhurst and that he lit a bag on fire and threw it on top of her, one testifying that appellant knew Tolhurst was dead when he left the apartment. Another witness, Daniel Pick, testified that approximately nine months before Tolhurst died, appellant told Pick that if he were ever to kill anybody he would burn them and that his brother was a "bigwig" in the fire department who would cover up any evidence that did not get burned.

A Benton County Sheriff's Deputy testified that on the morning of September 22, 1999, he notified an investigator with the St. Cloud police department that he had found a white shirt with blood on it in the back of his truck that morning. The deputy testified that he believed the shirt had been placed in his pick-up truck the night before sometime between 8:30 and 11:00 p.m. while he was at J.D. Beamer's. A waitress who worked at J.D. Beamer's testified that she saw appellant in the bar between 1:00 and 3:00 p.m. on September 21. She also testified that the white shirt found in the back of the Benton County deputy's truck was the same shirt appellant was wearing the afternoon of September 21. A bartender testified that appellant was wearing this white shirt on the afternoon of September 21, but that he was no longer wearing this shirt when she saw appellant in J.D. Beamer's for the second time that day, which was sometime after 8:30 p.m. A lab report from the Minnesota Bureau of Criminal Apprehension (BCA) was admitted into evidence identifying the source of the blood on this shirt as that of Tolhurst.

Two employees of a Little Duke's convenience store located near J.D. Beamer's testified that appellant came into the store just before 11:00 p.m. on September 21 and bought a bottle of soda and used the phone. Another witness, who was on his porch with some friends on the evening of September 21, testified that appellant came up to the front of his house, which was located across from Little Duke's, at around 11:00 p.m. that night. He stated that appellant asked if he could come into the house and indicated he was waiting for a cab that was going to show up at Little Duke's. The witness testified that appellant left when his cab arrived. The cab driver also testified. He stated that he picked appellant up at Little Duke's between 11:15 and 11:30 p.m. on September 21 and took him to the Germaine Towers.

Another witness called by the state, an investigator with the BCA, testified that three telephone cords were found cut in the apartment. Additionally, an investigator with the St. Cloud police testified that Tolhurst's clothes had ethanol on them, and a broken whiskey bottle was found next to Tolhurst's body as well as a nearly empty vodka bottle in the kitchen. A dep-

uty state fire marshal also testified that the fire in the apartment originated at Tolhurst's body, was consistent with the use of ethanol as an accelerant, and was intentionally set.

The medical examiner who conducted Tolhurst's autopsy testified that Tolhurst's arms were bound behind her back with duct tape and that she also had duct tape on her legs and around her neck. She testified that Tolhurst died from multiple traumatic injuries due to assault and that she was dead before the fire started. The injuries sustained by Tolhurst included facial and neck bruising, brain hemorrhaging, internal hemorrhaging around her neck consistent with manual strangulation, a broken hyoid bone, ten broken ribs, and thermal injuries from the fire.

The detective who interrogated appellant also took the stand and authenticated the videotape of appellant's initial statement and appellant's formal statement, the audiotape of the last part of appellant's formal statement, and transcripts of both appellant's initial and formal statements. The jury was then given transcripts of both of these statements, shown the videotape, and allowed to listen to the audiotape.

Appellant also took the stand. He testified that he was intoxicated when he arrived at his apartment on the night of September 21, 1999, and that he and Tolhurst got into an argument. He also testified that Tolhurst began irritating him, and he decided to leave the apartment. He told the jury that Tolhurst prevented him from leaving by pulling on him and hitting him with a steel cane. He reacted to Tolhurst's actions by pushing and hitting her. Next, appellant claimed that he saw Tolhurst without her wig on and observed blisters on the top of her head. He then claimed she told him that she was dying of AIDS. Appellant testified that he

became scared and tried to keep Tolhurst away from him by hitting her with his elbow. He admitted to kicking Tolhurst and to duct taping her legs together, although he claimed he did so because she was kicking him.

Appellant then testified that he left the bedroom for a moment, came back into the bedroom, grabbed a bag off the dresser, lit it on fire, and threw it on top of Tolhurst. As he threw the bag he stated, "Burn in hell, you bitch." Appellant then claimed that he patted the fire out right away. He acknowledged that he then left the apartment and did not call anyone for help. He also admitted that he knew Tolhurst was dead when he left the apartment, although he claimed he had neither planned nor intended to kill her.

Appellant testified that he went to J.D. Beamer's after leaving the apartment. He admitted to throwing the white shirt into the bed of a pick-up truck that was parked outside the bar before going in. He claimed that he had not been wearing that shirt earlier in the day, but that he grabbed it when he was leaving Tolhurst's apartment. Appellant then testified that he remembered most of what he did after leaving Tolhurst's apartment, including going to Little Duke's, calling a cab, and taking the cab to Germaine Towers. Appellant was subsequently found guilty of all five counts and sentenced to life without the possibility of parole.

Appellant asserts that he unequivocally invoked his right to counsel and that his federal and state constitutional rights were violated because the statements he made to the interrogating officers after invoking his right to counsel should have been suppressed. The state argues that the trial court did not err in finding that appellant did not in fact invoke his right to counsel.

## I.

■ Under the Fifth Amendment to the United States Constitution, an accused must be informed of his right to counsel prior to custodial police interrogation. *Miranda v. Arizona,* 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). If an accused asserts his right to counsel, interrogation must cease unless the accused initiates further communication, exchanges, or conversations with the police and validly waives his earlier request for the assistance of counsel. *Smith v. Illinois,* 469 U.S. 91, 94–95, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984) (citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). The United States Supreme Court has held that police interrogation need not cease unless the accused's invocation of the right to counsel is clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). In order for a request to be deemed unequivocal, a suspect " 'must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer, in the circumstances, would understand the statement to be a request for an attorney.' " *State v. Munson,* 594 N.W.2d 128, 139 (Minn.1999) (quoting *Davis,* 512 U.S. at 459, 114 S.Ct. 2350). However, we have continued to hold that the "stop and clarify" approach articulated in *Robinson,* 427 N.W.2d 217, is "an appropriate prophylactic measure to protect an accused's rights against compelled self-incrimination under the Minnesota Constitution." *State v. Risk,* 598 N.W.2d 642, 648 (Minn.1999) (citations omitted). According to the *Robinson* approach,

> [P]olice are required to cease questioning an accused once he or she has made an ambiguous or equivocal statement that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow questions designed to clarify the accused's true desires regarding counsel.

*Risk,* 598 N.W.2d at 648–49; *see also State v. Bradford,* 618 N.W.2d 782, 795–96 (Minn.2000) (reaffirming *Robinson* ). We have recognized that this approach provides more protection than is required by the United States Constitution. *Risk,* 598 N.W.2d at 649.

■ In reviewing a trial court's factual findings, including whether an accused invoked his right to counsel, we will uphold the court's determination unless it is clearly erroneous. *Munson,* 594 N.W.2d at 139 (citing *State v. Miller,* 573 N.W.2d 661, 671 (Minn.1998)). Here, the court found that appellant's statement "[c]an I have a drink of water and then lock me up—I think we really should have an attorney," was an equivocal request for counsel.

During the interrogation, appellant repeatedly asked the interrogating officers what they were talking to him about before appellant was finally told that the officers believed he had killed Tolhurst. Appellant responded in his next three answers by asking either, "[y]ou're saying I killed [Tolhurst]?" or "[y]ou think I killed [Tolhurst]?" After the detective responded to appellant's third question, the detective stated to appellant that the police did not only think that he killed Tolhurst, but "we know that." The detective then stated that the police wanted to know why appellant killed Tolhurst. Appellant responded by asking "Can I have a drink of water and then lock me up—I think we really should have an attorney."

■ In *Munson,* we held that the statement "I think I'd rather talk to a lawyer," coming almost immediately after the suspect was read his *Miranda* rights, constituted an unequivocal request for counsel. *Munson,* 594 N.W.2d at 139–40. We also recognized that the objective sufficiency of

Munson's invocation of his right to counsel was supported by the reaction of the interrogating officers to Munson's request, namely the fact that the record indicated that they did not consider his request to be equivocal. *Id.* Here, the detective reacted to appellant's statement regarding counsel by saying, " 'Kay. If you want to talk to an attorney, you understand that we have to stop talking to you. OK?" Like the officers in *Munson*, the detective's reaction following appellant's request for counsel further supports the objective sufficiency of appellant's invocation of his right to counsel. We hold that the trial court clearly erred in finding that appellant's request for counsel was equivocal. Appellant's statement was sufficiently clear that a reasonable police officer under the same circumstances would have understood the statement to be a request for an attorney, and was therefore unequivocal. *See Munson*, 594 N.W.2d at 139. Because of this error, the remainder of the trial court's analysis as to appellant's invocation of his right to counsel was inappropriate because it was based on an erroneous finding that appellant only made an equivocal request for counsel.[2]

## II.

▇ Once a suspect unequivocally invokes his right to counsel, " 'courts may admit responses to further questioning only on finding that [the suspect] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right invoked.' " *Munson*, 594 N.W.2d at 138–39 (quoting *Smith*, 469 U.S. at 95, 105 S.Ct. 490). These inquiries are sepa-

rate; even if a suspect initiates further conversation, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." *Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983); *see also Munson*, 594 N.W.2d at 141 (recognizing that Minnesota courts have held that the burden of proof with respect to the issue of whether the suspect waived his right to counsel falls squarely on the state).

Here, appellant requested a drink of water and then unequivocally invoked his right to counsel. The detective responded by telling appellant that the officers would get him a drink of water. Appellant then stated that he did not want to talk anymore, paused, and then made a statement about Paul Mackey. The detective then acknowledged appellant's request for counsel by stating, " 'Kay. If you want to talk to an attorney, you understand that we have to stop talking to you. OK? And— and then your side of this story will never be known. That's your. choice. That's a choice you're making." It is clear from this response that the detective understood that appellant had just invoked his right to counsel. Despite this understanding, the detective proceeded to tell appellant that he had a choice to make, to which appellant responded by asking, "[so] that means what?"

▇ As discussed above, the trial court erroneously held that appellant made an equivocal request for counsel. Under these facts, the court also erred in conclud-

---

**2.** Even if appellant's request for an attorney was equivocal, the trial court clearly erred in holding that the detective's comments constituted a clarifying question designed to determine appellant's true desires with respect to counsel, as authorized by *Risk*. *Risk*, 598 N.W.2d at 650. Rather, the detective's state-

ment that appellant's "side of [the] story [would] never be known" implied that appellant had to make a choice between either talking to an attorney and never having his side of the story known or continuing to talk with the officers.

ing that the detective asked an appropriate clarifying question, because along with the detective's comments related to stopping the interrogation if appellant wanted an attorney, the detective also warned appellant that, as a consequence of appellant talking to an attorney, his "side of [the] story [would] never be known." The court found that appellant's "re-initiation of the conversation" after the detective's question "manifested a voluntary, knowing and intelligent intention on the part of the [appellant] to proceed without assistance of counsel." The court reasoned that this reinitiation occurred when appellant asked a "question of his own," which question presumably was "[s]o that means what?" However, this question posed by appellant was prompted by the detective's improper comments to appellant before counsel had been made available. The Supreme Court in *Edwards* strongly reiterated that "additional safeguards are necessary when the accused asks for counsel." *Edwards*, 451 U.S. at 484, 101 S.Ct. 1880. We agree with this principle and hold that the additional safeguards necessary when an accused asks for counsel were not present in this case and that the interrogating officers failed to limit their questions to ones designed to clarify the appellant's desires regarding the presence of counsel.

■ We recognize that the trial court also found that appellant reinitiated the conversation with police with his statement about Paul Mackey when considering whether appellant waived his right to remain silent. Even if we assume without deciding that this statement also constituted a reinitiation by appellant for purposes of the *Edwards* analysis relating to requests for counsel, we still must consider whether a valid waiver of the right to counsel occurred. *See Bradshaw*, 462 U.S. at 1046, 103 S.Ct. 2830.

■ In proving that a valid *Miranda* waiver took place, a "heavy burden" rests on the state to demonstrate that the accused knowingly, intelligently, and voluntarily waived his right to counsel. *State v. Linder*, 268 N.W.2d 734, 735 (Minn. 1978) (quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602). On appeal, we review the trial court's findings of fact as to the circumstances surrounding a suspect's statements for clear error. *See Miller*, 573 N.W.2d at 672. However, we make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the suspect's waiver was knowing, intelligent, and voluntary. *State v. Dominguez–Ramirez*, 563 N.W.2d 245, 252 (Minn.1997) (citing *Linder*, 268 N.W.2d at 735). Because the trial court found that appellant never invoked his right to counsel, it concluded that it need not address whether a voluntary waiver of the right to counsel occurred. Nevertheless, the court did make findings of fact as to the circumstances surrounding appellant's statements, and we must independently determine whether, based on these findings of fact, appellant knowingly, intelligently, and voluntarily waived his right to counsel.

After appellant made the statement about Paul Mackey, the detective told appellant that if he wanted to talk to an attorney his "side of [the] story [would] never be known." When appellant asked the detective what he meant, the detective told appellant that the police were going to "put this thing together and [convict appellant] of murder." We conclude that the detective's statements were designed to induce appellant to continue talking and were improper. Other than the fact that appellant made a further statement, there is nothing in the record to indicate that appellant waived the right to counsel he had invoked. Even if appellant's statement constituted an initiation of further

conversation under *Edwards,* this statement cannot, by itself, suffice to show a waiver of appellant's asserted right to counsel. *See Bradshaw,* 462 U.S. at 1045, 103 S.Ct. 2830. Accordingly, based on the totality of the circumstances, we hold that the state failed to prove by a fair preponderance of the evidence that appellant knowingly, intelligently, and voluntarily waived his right to counsel. Therefore, his subsequent statements were admitted in error.

### III.

As we recognized in *Munson,* a determination that the trial court erred in admitting a defendant's statements does not end our analysis. *Munson,* 594 N.W.2d at 143. Appellant's conviction may stand notwithstanding a violation of his federal or state constitutional rights if the admission of the statements was harmless beyond a reasonable doubt. *Id.; see also Risk,* 598 N.W.2d at 650. An error is harmless beyond a reasonable doubt only if the verdict was "surely unattributable" to the error. *State v. McDonough,* 631 N.W.2d 373, 384 (Minn.2001). In deciding this issue, the question we must answer is " '[w]hat effect did the jury's hearing [the defendant's] statement * * * actually have on the guilty verdict rendered?' " *State v. Day,* 619 N.W.2d 745, 750 (Minn.2000) (quoting *State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997)). In other words, the weight of the evidence must be so overwhelming that a reasonable jury would have arrived at the verdict without the prejudicial evidence. *Juarez,* 572 N.W.2d at 291.

Here, appellant's statements to the interrogating officers introduced at trial provided evidence that linked appellant to this crime. There were no eyewitnesses to the crime itself and neither witness who testified about hearing an argument coming from Tolhurst's apartment on September 21, 1999, could identify appellant's voice as one of the voices. Appellant's statements implicated him as being in the apartment and arguing with Tolhurst at or about the time of her death. His statements further identified him as the person responsible for all of Tolhurst's injuries, for taping her legs together, for starting the fire in her apartment, and as the owner of the white shirt that was found with Tolhurst's blood on it. These statements constituted significant admissions almost amounting to a full confession. They substantially corroborated the circumstantial evidence of the murder, including the motive, mode, opportunity, and time. In the state's case-in-chief, appellant's statements were presented to the jury in five different ways: transcripts of both appellant's initial statement and appellant's formal statement, a videotape of both statements, and an audiotape. These statements were introduced by the state to support its theory that appellant intended to kill Tolhurst, with intent to kill being a requisite element of each charged offense, and were also used to support the state's case as to the two counts of intentional murder while committing a kidnapping and one count of intentional murder while committing arson. Under these facts, we hold that the admission of appellant's statements made after he invoked his right to counsel was not harmless beyond a reasonable doubt and appellant is entitled to a new trial.

Reversed and remanded for a new trial.