STATE of Minnesota, Appellant,

v.

Kathleen Mary MARSHALL, n/k/a Kathleen Mary Hartmon, Respondent.

No. C2-01-1309.

Court of Appeals of Minnesota.

April 2, 2002.

Review Denied May 28, 2002.

Mike Hatch, Attorney General, St. Paul, MN; and James C. Backstrom, Dakota County Attorney, Kathryn M. Keena, Assistant County Attorney, Dakota County Judicial Center, Hastings, MN, for appellant.

Mark D. Nyvold, Attorney at Law, St. Paul, MN, for respondent.

Considered and decided by LANSING, Presiding Judge, KLAPHAKE, Judge, and HUSPENI, Judge.*

## OPINION

LANSING, Judge.

Following indictment for first-degree murder in the 1982 death of her 18 month old son, Mary Hartmon brought a pretrial motion to suppress five statements made to police over the course of nearly 20 years, to sanction the Dakota County Attorney, to limit reference to a missing or destroyed 911 tape, and to dismiss the grand-jury indictment. The district court denied the motions to sanction the county attorney, to dismiss the indictment, and to suppress three of the statements. The court granted the motion to limit reference to the 911 tape and to suppress statements to law enforcement authorities made on January 16, 1985, and November 14, 2000. The state, in this pretrial appeal, challenges that part of the district court's order suppressing the 1985 and 2000 statements.

## FACTS

Kathleen Hartmon's son, Jeremy, died in his crib on February 19, 1982. Jeremy was 18 months old and had a bronchitis infection that had required medical treatment before his death. On the day of his death, according to Hartmon, he fell asleep on the floor of their apartment and about noon she placed him in his crib.

At 1:09 p.m., Hartmon called 911 and reported that Jeremy was not breathing. Officers arrived at Hartmon's apartment at 1:12 p.m.; Jeremy was not breathing, had no pulse, and was bluish in color. The ambulance transported Jeremy to Divine Redeemer Hospital and then to Children's Hospital. Medical personnel were unable to resuscitate him. The original autopsy report indicated that Jeremy died from tracheobronchitis and bronchiolitis, natural causes. In 1984, another medical examiner, in response to police inquiries, changed the cause of death from natural to undetermined. In 2000, that medical examiner, responding to materials submitted by police, changed the cause of death to homicide.

The facts relevant to this appeal revolve around the statements made by Hartmon in January 1985 and November 2000. Hartmon made the January 1985 statements to a Dakota County Sheriff's lieutenant and a detective during a welfare fraud investigation. When Hartmon reported to the probation office, the lieutenant arrested Hartmon on a welfare-fraud warrant. The lieutenant read Hartmon her *Miranda* rights and asked her if she "wish[ed] to talk to us now?" Hartmon said, "No. I don't wish to say anything." The lieutenant and the detective told Hartmon that she was being arrested for welfare fraud and then began to question Hartmon about Jeremy's death. During the extended questioning, Hartmon denied any involvement in Jeremy's death. The detective told Hartmon that he would "keep bothering" her until she told the truth about Jeremy's death and that he did not believe her when she said she did not kill Jeremy.

The detective told the court that Hartmon, while being transported in a squad car to the Dakota County jail, confessed to killing Jeremy. Unlike the other two interviews that occurred on this day, no tape recording or transcript exists of this con-

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

versation. At the Dakota County jail, the detective continued the questioning after he again read Hartmon her *Miranda* rights. During this questioning, Hartmon made statements indicating that she did not want Jeremy to suffer and that Jeremy may have been the source of discord between Hartmon and her husband.

On November 14, 2000, two Minnesota Bureau of Criminal Apprehension (BCA) agents arrived at Hartmon's apartment unannounced shortly before 5 p.m. and told Hartmon they wanted to discuss Jeremy's death. The interview lasted approximately 90 minutes. Hartmon had been up since 1:30 a.m. that morning, had worked all day, and had not eaten breakfast, lunch, or supper. Hartmon's seven-year-old daughter was also in the apartment. The agents had the daughter separated from her mother and placed in a back bedroom, where she ate her supper and watched TV. Hartmon was not reunited with her daughter until after the interview.

The BCA agents did not give Hartmon a *Miranda* warning. Although they did not display their weapons, Hartmon could tell one of them was armed. The agents did not place Hartmon under arrest; however, they did not tell her that she was free to leave or that she was free to end the conversation. Although the agents did not restrict Hartmon's movements, they did ask Hartmon if there were other exits from the apartment.

Hartmon was distraught throughout much of the interrogation. She cried at several points, at one point stating she couldn't breathe because she was crying. During most of the interview, Hartmon professed her innocence. However, after the agents had talked at length with her, discussing the possible sentence she would receive, the spiritual consequences of her refusal to confess, the continued persistence of police in seeking her confession,

and other factors, Hartmon finally told the agents that she took Jeremy's life away from him by holding a washcloth over his mouth for less than a minute.

The district court issued an order suppressing Hartmon's January 16, 1985, confession because police had failed to honor her invocation of the right to silence. The court made extensive factual findings relating to the November 14, 2000 statement and ruled that because the statement was not made voluntarily it would be inadmissible at trial. The court also denied Hartmon's motion to dismiss the grand jury indictment and her motion to sanction the prosecution for alleged discovery violations.

In this pretrial appeal, the state challenges the suppression of the January 1985 and the November 2000 statements.

### ISSUES

I. Did the district court err in suppressing Hartmon's January 1985 statements as a violation of her right to remain silent?

II. Did the district court err in suppressing Hartmon's November 2000 statements as involuntary and, therefore, in violation of her right to due process?

### ANALYSIS

We will reverse a district court's pretrial determination in a criminal prosecution only if the state demonstrates clearly and unequivocally that the district court erred in its judgment and the error will have a critical impact on the outcome of the trial absent reversal. *State v. Joon Kyu Kim*, 398 N.W.2d 544, 547 (Minn. 1987). The critical impact standard is demanding but it "does not require that the suppression order render the available proof insufficient as a matter of law, or so

weak as to effectively destroy a successful prosecution." *State v. Edrozo,* 578 N.W.2d 719, 723 (Minn.1998). It is undisputed that the suppression of the statements may have a critical impact on the outcome of the trial.

## I

 Under the Fifth Amendment no person may be compelled to be a witness against himself or herself in a criminal case. U.S. Const. amend. V. The right to cut off questioning is essential in guarding an accused's Fifth Amendment protection against self-incrimination. *See Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975) (labeling right to remain silent a "critical safeguard"). An accused, through the exercise of the option to terminate questioning, "can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103–04, 96 S.Ct. at 326. The right to remain silent "counteracts the coercive pressures of the custodial setting." *Id.* at 104, 96 S.Ct. at 326.

 "[I]f the individual indicates in any manner, at any time prior to or during questioning, that [he or she] wishes to remain silent, the interrogation must cease." *State v. Wilson,* 535 N.W.2d 597, 602 (Minn.1995) (quoting *Miranda v. Arizona,* 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966)). The judiciary, however, should not substitute its judgment on the meaning of a suspect's actions for the judgment of police officers. *State v. Williams,* 535 N.W.2d 277, 283 (Minn. 1995). Thus, for constitutional protections to apply, an accused must unambiguously and unequivocally invoke the right to remain silent. *Id.* at 285; *Wilson,* 535 N.W.2d at 603.

 An appellate court reviews the factual issue of whether an accused unequivocally and unambiguously invoked the right to remain silent for clear error. *State v. Hannon,* 636 N.W.2d 796, 804 (Minn.2001) (applying the clear-error standard in reviewing district court's finding that accused did not unambiguously and unequivocally invoke his right to counsel). In two recent cases, the Minnesota Supreme Court has adopted a bright-line approach to reviewing invocation of *Miranda* rights. *See id.* at 804–05 (finding unequivocal and unambiguous invocation of right to counsel when accused stated, "Can I have a drink of water and then lock me up—I think we really should have an attorney."); *State v. Day,* 619 N.W.2d 745, 750 (Minn.2000) (finding unequivocal and unambiguous invocation of right to remain silent when accused stated, "Said I don't want to tell you guys anything to say about me in court."). The inquiry is whether the accused asserted his right in a way that a reasonable police officer in the same circumstances would understand the statement to be an invocation of the right to remain silent. *Id.* at 749.

The district court found that after the investigators read Hartmon her *Miranda* rights they asked if she would like to speak with them. Hartmon responded, "No. I don't wish to say anything." We agree with the district court that Hartmon's response unequivocally and unambiguously invoked her right to silence. *See id.* at 749–50 (noting that accused clearly invoked right to remain silent by making a statement invoking right immediately after being read *Miranda* rights).

 The state contends that, after invoking her right to silence, Hartmon essentially withdrew it by saying "What am I ... what am I...." This claim must be analyzed in the context of whether the investigating officers scrupulously honored Hartmon's invocation of her Fifth Amendment right. *See Mosley,* 423 U.S. at 102–

06, 96 S.Ct. at 325–27; *Day,* 619 N.W.2d at 750.

Once an accused has invoked the right to remain silent, investigating officers must cease the interrogation. *State v. Thieman,* 439 N.W.2d 1, 5 (Minn. 1989). Investigating officers violate the accused's right to remain silent when they refuse to stop the interrogation or attempt to wear down the accused's resistance and force a change of mind. *Day,* 619 N.W.2d at 750 (citing *Mosley,* 423 U.S. at 105–06, 96 S.Ct. at 327). Importantly, the United States Supreme Court has noted that when investigating officers resume interrogation after a "momentary cessation," the purpose of *Miranda* is frustrated. *Mosley,* 423 U.S. at 102, 96 S.Ct. at 326.

After Hartmon said "No. I don't wish to say anything," the investigating officers began to describe the charges underlying the arrest for welfare fraud. But the officers then abruptly changed the subject of the interrogation to the death of Jeremy. One of the officers chastised Hartmon for not returning his telephone inquiries about Jeremy's death and told Hartmon that her life was not going to get "squared away" until the police resolved the investigation into Jeremy's death. This same officer, knowing that Hartmon had strong religious beliefs, attempted to exploit those beliefs to get her to talk to him. One of the officers continued the questioning about Jeremy's death as they transported Hartmon to the Dakota County jail. At the jail, the officers again initiated interrogation about Jeremy's death. After a few hours of questioning, Hartmon finally made statements suggesting that she did not want Jeremy to suffer and that Jeremy created tension in her marriage.

This extended interrogation did not "scrupulously honor" Hartmon's invocation of her right to counsel. *See Mosley,* 423 U.S. at 104, 96 S.Ct. at 326 (footnote omit-ted). Not only was the questioning persistent, it was virtually uninterrupted by Hartmon's unequivocal, unambiguous response, "No. I don't wish to say anything." The district court did not err in suppressing Hartmon's January 1985 statements.

Hartmon alternatively argues that the statements should be suppressed because she was represented by counsel at the time of the questioning, and counsel had sent Dakota County a letter stating that Hartmon should not be questioned unless the attorney was present, and the investigators violated the right to have counsel present. Because we affirm the district court's suppression for failure to cease questioning when Hartmon invoked her right to counsel, we do not address Hartmon's alternative ground.

## II

We now turn to the question of whether Hartmon's November 2000 statements were voluntary.

In reviewing a confession for voluntariness, courts must consider the totality of the circumstances, including factors that focus on the defendant and factors that focus on the interrogation process itself. *State v. Ritt,* 599 N.W.2d 802, 808 (Minn.1999). The subjective factors include, but are not limited to, age, maturity, intelligence, education, and experience with the criminal justice system. *State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991). In reviewing the interrogation process, courts often focus on the length of the interrogation, the adequacy or lack of warnings, the denial of physical needs during the interrogation, the denial of access to friends and family during the interrogation, and the statements of the interrogator, specifically whether the statements are of the character that would convince an innocent person to con-

fess. *Id.; State v. Slowinski,* 450 N.W.2d 107, 112 (Minn.1990).

 Both the United States Supreme Court and the Minnesota Supreme Court apply independent appellate review to the issue of whether a defendant's statements were given voluntarily. *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 450–51, 88 L.Ed.2d 405 (1985); *Ritt,* 599 N.W.2d at 808. But the legal question is predicated on the district court's fact findings. *Ritt,* 599 N.W.2d at 808. The district court made detailed and careful findings on the issue of whether Hartmon's November 2000 statements were voluntary.

At the time of the November 2000 interrogation, Hartmon was 46 years old, had been married three times, had given birth to four children, and was raising a seven-year-old daughter on her own. She did not complete high school but had obtained her GED. She had been regularly employed as a newspaper and advertisement delivery person for two-and-one-half years. Hartmon had prior experience with the criminal justice system. She had previously been on probation for aggravated forgery and had previously been convicted of welfare fraud. These factors suggest that Hartmon was an experienced, mature adult. But the district court also found that Hartmon was of limited intelligence, as demonstrated by a psychological evaluation completed two-and-one-half years after Jeremy's death that showed Hartmon had low-average to average intelligence. The court also cited Hartmon's statements during the interrogation. The psychological evaluation also indicated that Hartmon had a significant need to appear in a favorable light and was psychologically dependent, immature, and naïve.

We begin our analysis of the interrogation process by noting that the BCA agents did not read Hartmon her *Miranda* rights during the entire 90 minute interrogation. *See Slowinski,* 450 N.W.2d at 111 (concluding confession was voluntary, in part because the defendant was read his *Miranda* rights at the outset). Although the district court concluded that Hartmon was not in custody during the interrogation, Hartmon was confronted by two officers, one of whom she could tell was armed, who inquired about the apartment's exits and told Hartmon to keep the door open when she used the bathroom. Therefore, at least some of the inherently coercive aspects of custodial interrogation were present.

The BCA agents appeared at Hartmon's door without warning. *Cf. Ritt,* 599 N.W.2d at 809 (noting that defendant, whose statement was ruled voluntary, "had scheduled the time of the interview" with police). The investigators suggested that Hartmon's seven-year-old daughter, for whom Hartmon was preparing supper, watch television and eat her supper in another room of the apartment so she would not overhear the substance of the conversation. At one point, an officer checked on Hartmon's daughter. Although the evidence does not show the agents prevented Hartmon from having any contact with her daughter, they effectively discouraged it. *Cf. Slowinski,* 450 N.W.2d at 111 (noting defendant, although his first request to speak with his wife was refused, was eventually allowed to call her).

Three times during the interrogation, Hartmon became so emotionally upset that she cried, stated that her "head is swimming," and had difficulty breathing. *Cf. Ritt,* 599 N.W.2d at 810 (noting defendant "did not cry or break down emotionally" during police interrogation). Although the agents expressed concern and asked if Hartmon needed medical assistance, they did not offer to suspend their questioning.

*See Pilcher,* 472 N.W.2d at 334 (noting that an emotionally distressed defendant should be allowed an opportunity to regain composure before confession and indicating that emotional state may threaten the defendant's ability to voluntarily confess). Moreover, the officers exploited Hartmon's religious beliefs, telling her she had a mortal sin on her soul and that she would go to hell unless she would "get forgiveness" for it by confessing. This line of questioning, which apparently prompted Hartmon's emotional distress, was inherently coercive. *See generally Brewer v. Williams,* 430 U.S. 387, 412, 97 S.Ct. 1232, 1246, 51 L.Ed.2d 424 (1977) (Powell, J., concurring) (noting that officer's speech about ensuring proper "Christian burial" for victim exploited religious convictions of defendant who had a history of mental disorders).

The record establishes that Hartmon was both tired, having been up since 1:30 a.m., and hungry, having had little to eat during the day. *Cf. State v. Ritt,* 599 N.W.2d at 810 (noting defendant "gave no indication of being overly tired"). Although it was the supper hour, there is no indication that the agents offered to let Hartmon eat, although she did smoke. *Cf. Slowinski,* 450 N.W.2d at 111 (noting the defendant was allowed to smoke and drink soft drinks).

One of the agents testified at the omnibus hearing that he went to Hartmon's apartment intending to secure a confession. Although the officers' intent is not determinative of the nature of the interview, their relentless questioning, in the face of Hartmon's insistence on her innocence, contributed to the coercive atmosphere of the interrogation. *Cf. State v. Mills,* 562 N.W.2d 276, 283 (Minn.1997) (noting that police, before obtaining statement held voluntary, did not view defendant as a suspect and were talking to her merely to establish rapport and under-

stand the case). One of the agents implied that the questioning would continue until Hartmon kicked them out of the apartment.

The ultimate question in determining whether a confession is voluntary is whether the police conduct would have overborne the will of an innocent person. *Ritt,* 599 N.W.2d at 810. The BCA agents' interrogation of Hartmon created a coercive atmosphere in Hartmon's apartment, culminating almost 20 years of repeated investigatory pursuit and targeting Hartmon's particular vulnerabilities in a way that persuaded the district court that Hartmon's statements were testimonially untrustworthy. We agree. The questioning was not merely "unpleasant," *see id.,* it was, given the totality of the circumstances, inherently coercive.

The United States Supreme Court has held "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller,* 474 U.S. at 109, 106 S.Ct. at 449 (1985). Expressing the same principle, the Minnesota Supreme Court has observed that the "[b]lood of the accused is not the only hallmark of an unconstitutional inquisition * * * and the use of promises, trickery, deceit, and stress-inducing techniques in obtaining confessions have all been condemned." *Pilcher,* 472 N.W.2d at 333 (citations omitted).

Police investigators face substantial obstacles in resolving an investigation of a death that occurred almost twenty years ago; confessions are one of the limited avenues available to them. But incriminating statements produced by coercion are inherently untrustworthy and undermine fundamental concepts of due process. *State v. Garner,* 294 N.W.2d 725, 727

(Minn.1980). "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Escobedo v. Illinois,* 378 U.S. 478, 488–89, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977 (1964) (footnotes omitted).

We affirm the district court's suppression of the November 2000 statements as violating Hartmon's due process rights.

## DECISION

The district court did not err in suppressing Hartmon's January 1985 statements because Hartmon invoked her right to remain silent and the investigators did not scrupulously honor that right. The investigators' conduct in obtaining the November 2000 statement was overly coercive and violated Hartmon's due process rights. We affirm the suppression of both statements.

**Affirmed.**