## STATE v. RICHARD H. BREHMER.

160 N. W. (2d) 669.

August 2, 1968—No. 41,087.

*C. Paul Jones,* State Public Defender, and *Ronald C. Elmquist,* for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, and *J. Dennis O'Brien,* Special Assistant Attorney General, for respondent.

Heard before Knutson, C. J., and Nelson, Murphy, Otis, and Frank T. Gallagher, JJ.

FRANK T. GALLAGHER, JUSTICE.

Appeal from a judgment convicting defendant of criminal negligence resulting in death.

At about 10 p. m. on September 3, 1965, Raymond Umberger, an over-the-road truckdriver, was driving a semitractor south on Carimona Street in Winona, Minnesota. He brought the tractor to a stop at the intersection of Carimona and Third Street with the front wheels even with the Third Street curb. Nothing was coming from his right. Looking to his left, he saw a car about a block and a quarter away proceeding west on Third Street. No other cars were approaching from his left. He proceeded into the intersection, intending to turn left on Third Street. Immediately after he entered the intersection he heard tires squealing and, looking to his left, saw a car coming at him from 120 to 150 feet away. As his front wheels reached the center of Third Street, and just as he was beginning to swing left, the car hit the tractor. About 3 or 4 seconds had elapsed from the time he had seen the car a block and a quarter away until he was hit. On impact, the tractor bounced backward and hit a tree on the northwest corner of the intersection, and then came to rest 41 feet from the point of impact. The front end of the car to the point of the windshield was almost completely destroyed. At the point of collision the car was entirely within its own lane.

Umberger testified that the car was going between 90 and 100 miles an hour. An eyewitness who observed the car as it approached the intersection estimated its speed as between 70 and 80 miles per hour. Another eyewitness, unable to estimate its speed, could only say that it was moving "fast." After the driver applied the brakes, the car left heavy, black skid marks for 53 long paces on Third Street, which has a concrete surface and was dry at the time of the accident.

Almost immediately after the accident, Winona Police Officers James Bronk and Glenn Morgan arrived on the scene. Bronk looked into the car and saw a male occupant, later identified as defendant, slumped over the wheel. An open, partially filled beer bottle stood on the floor between the driver's legs. Bronk determined that defendant was unconscious but still living. He was removed to a hospital and survived.

Bronk's observation of the automobile also revealed a female occupant,

later identified as Karen Thilmany, partially under the dash on the passenger side of the front seat. He felt for a pulse but could detect none. Karen was dead on arrival at Winona Memorial Hospital. The coroner testified that she died of multiple fractures suffered in the accident.

The day before the accident, at about 2 p. m., defendant, with Karen Thilmany and Arthur Huebner as passengers, drove his car from Winona to Plainview. In Plainview, defendant and Karen stopped off at the Cozy Corner bar and Huebner took defendant's car. About an hour later Huebner picked up defendant and Karen outside the bar and defendant again took the wheel.

From Plainview they went to Elba, where they stopped at another bar. Here defendant had a few rounds of tap beer and a few shots of whiskey. Defendant then bought a case of beer and he, Huebner, and Karen drove out to the country and drank some of it. Defendant drank about eight bottles from the case at this time. The three of them returned to Winona and got something to eat. While in Winona at this time, defendant and Huebner drank the six bottles still remaining in the case.

From Winona, the party crossed the river to La Crosse, Wisconsin, and there purchased a 6-pack of strong beer. By this time, apparently, defendant and Karen had decided to get married, and all three left for Dubuque, Iowa, with Huebner driving.

They arrived in Dubuque at 1 or 2 a. m. September 3. They were directed to a justice of the peace, who informed them that there could be no marriage without a marriage license.

They then started for Winona, again with Huebner driving, but a short way out of Dubuque defendant took over the car. Except for this stop to change drivers, they did not stop at any point when driving from La Crosse to Dubuque and from Dubuque back to Winona. On the way back from Dubuque Huebner suggested that defendant slow down. Huebner said he would do so "for a while" and then "speed up again." None of the three had anything to drink between Dubuque and Winona. They got back to Winona about 6:30 or 7 in the morning.

They drove around briefly after arriving in Winona, and then went to the Thilmany residence. Shortly thereafter defendant purchased a case

of beer and took it back to the Thilmany residence. Defendant, Huebner, Karen's brother, George Thilmany, Jr., and Karen's mother drank from this case until 11 a. m., at which time half of the case remained. Defendant consumed about four bottles and also, apparently, had some "bloody Marys."

At 11 a. m. Huebner and George left to pick up Huebner's salary check. They then bought another case of beer, went to McDonald's to eat, and returned to Thilmany's. They were gone approximately 2 hours.

When George and Huebner got back, the group began drinking and talking again. Soon after they returned, defendant left and bought something for Karen and himself to eat. About 3 p. m. defendant took George to work and then he, Karen, and Huebner drove Mrs. Thilmany to a cemetery to visit the grave of one of her children. By the time they left for the cemetery, there was one full case of beer left.

After visiting the cemetery, the party went to Dorothy's Bar in Winona. They were joined there by one Romelle Kamrowski. They stayed at Dorothy's for 1 or 1½ hours, during which time defendant had three tap beers. When they left around 6 o'clock, defendant bought another 6-pack of beer.

With defendant driving, the party, including Miss Kamrowski, left Winona for Dodge, Wisconsin. Defendant drank beer on the way to Dodge. The group stopped at a bar in Dodge, where defendant had two hard drinks.

From Dodge, the party proceeded to the Midway, a bar on the highway between Fountain City and Centerville, Wisconsin. Defendant was driving and Huebner noticed that he crossed the centerline on curves, but otherwise noticed nothing unusual about defendant's handling of the car. Miss Kamrowski testified that defendant was driving between 65 and 70 miles per hour and that he occasionally swerved over the centerline or onto the shoulder. She was scared, she said, but did not voice her fear.

Upon reaching the Midway, defendant had a bottle of beer from the car trunk. He also had one or two vodkas in the tavern.

With defendant driving, the party left the Midway for Winona at about 8:45 p. m. Defendant drove at a speed between 75 and 80 miles

per hour. Again, he occasionally swerved over the centerline and onto the shoulder. Again Miss Kamrowski was afraid but said nothing.

When the party got back to Winona, defendant dropped the others off at the Tally Ho Tavern and took Karen for a ride. By this time, according to Huebner, defendant was "high." It was about an hour later that the accident occurred.

On September 24, 1965, a preliminary hearing was held before a judge of the Winona municipal court, who bound defendant over to the Winona County District Court, and on September 27 defendant was charged by information with having unlawfully caused the death of Karen Thilmany by operating a motor vehicle in a grossly negligent and criminal manner. Defendant, appearing with counsel, was arraigned before the district court on January 10, 1966. He pled not guilty.

On February 1, 1966, defendant was granted a change of venue to Olmsted County. However, defendant and counsel later agreed to trial before a judge in Winona County. The case was tried before the court without a jury on February 15 and 16, 1966. On February 24 the judge found defendant guilty as charged and ordered a presentence investigation.

On May 9, 1966, defendant appeared for sentencing. At that time the judge deferred sentencing for 4 years and placed defendant on probation. He later violated probation, and on June 28, 1967, he was sentenced to the St. Cloud Reformatory for an indeterminate term.

The issues presented on this appeal are whether the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt and whether the trial court erred in failing to order a new trial after a presentence investigation disclosed certain evidence not adduced at trial.

■ Minn. St. 609.21, under which defendant was convicted, provides:

"Whoever operates a vehicle * * * in a grossly negligent manner and thereby causes the death of a human being not constituting murder or manslaughter is guilty of criminal negligence in the operation of a vehicle resulting in death and may be sentenced to imprisonment for not more than five years or to payment of a fine of not more than $5,000, or both."

In State v. Bolsinger, 221 Minn. 154, 21 N. W. (2d) 480, gross negligence was defined as a very high degree of negligence. Unlike recklessness, said the court, gross negligence requires no conscious and intentional action which the actor knows, or should know, creates an unreasonable risk of harm to others. Negligence, even though extreme negligence, is all that is required.

Measured by the Bolsinger test, the evidence here is quite obviously sufficient to sustain the finding of guilty. As attested by the eyewitnesses, the skid marks, and the condition and position of the vehicles after impact, defendant clearly approached the intersection at an extremely high rate of speed. There is a strong likelihood, moreover, that his reflexes were dulled by an excess of alcohol. He had been drinking heavily for over a day prior to the accident. The evidence of the extremely high speed of his driving, particularly when coupled with the excessive drinking, would permit a finding of recklessness. Obviously, it permits a finding of gross negligence. In Bolsinger, the court held that while drunken driving will not in itself provide grounds for a homicide conviction, such driving in connection with other circumstances warrants such a conviction. 221 Minn. 178, 21 N. W. (2d) 494.

Defendant seeks to attack the evidence relating to drunkenness on the grounds that the state did not introduce scientific evidence of intoxication. The short answer to this attack is that scientific proof of inebriation is unnecessary for the effects of alcohol consumed in large quantities are widely known. Several cases have upheld convictions based on findings of inebriation even though those findings were apparently not supported by blood samples or expert testimony. See, for example, State v. Brady, 244 Minn. 455, 70 N. W. (2d) 449 (new trial granted on other grounds); State v. Kline, 168 Minn. 263, 209 N. W. 881; State v. Bolsinger, supra. Defendant further contends that the failure of the passengers to object to his driving discloses that he was not intoxicated. Such a failure is, of course, evidence, but it is not conclusive. Admittedly, defendant had drunk heavily. Two witnesses testified that he drove a bit unsteadily from Dodge to the Midway and from the Midway to Winona. Huebner said defendant was "high" when he reached Winona. This evidence suffices to support a finding that defendant was under the influence of alcohol.

On the issue of speed, defendant seeks to impeach the reliability of the eyewitnesses. The reliability of those witnesses is a question for the trier of fact—in this case, the trial judge. He apparently chose to believe the eyewitnesses, and their testimony is not so inherently improbable that this court can say it was error for him to do so. Defendant also contends that the tractor's final position 41 feet from the point of impact does not give evidence of speed, for the impact might have jolted it into reverse, which in turn might have caused it to back into its final position. But here again the trial judge is the weigher of fact, and there is evidence from which he could find that the impact bounced the tractor into the position in which it was found after impact. And in any event, quite apart from eyewitness testimony and the terminal position of the tractor, the long, heavy skid marks and the extensive damage caused to the car support a finding of excessive speed.

At defendant's appearance on February 24, the trial court, commenting on its finding of guilt, said that "the defendant was in no position to drive, in any event, even if he hadn't been drinking, because a man who hasn't slept for thirty hours has his reflexes so impaired that it is difficult for him to react as quickly and as properly as he should have." Referring to this comment, defendant alleges that the court put "special emphasis" on a fact—absence of sleep—not supported by the record. It is true that the record does not sustain a finding that defendant got no sleep during the 30 hours previous to the accident. He might have slept during the trip from La Crosse to Dubuque and during the 2 hours on September 3 when Huebner and George were absent. The fallacy in defendant's argument lies in supposing that the trial judge put "special emphasis" on lack of sleep. As the use of the words "in any event" would indicate, he mentioned the lack of sleep only as a makeweight to buttress a conclusion already reached. Clearly, his finding as to lack of sleep was not determinative of his finding of criminal negligence. Furthermore, while it cannot be said that defendant got no sleep, it can be said that he got insufficient sleep. Thus, even assuming that the trial judge put great stock in the finding of lack of sleep, that finding was not prejudicial.

The evidence is sufficient to support the verdict.

■ Defendant's second argument appears to be that the trial court

should have ordered a new trial because of evidence concerning Karen's unstable mental condition, which evidence was uncovered after trial. Karen was subject to suicidal tendencies, it is said, which might have prompted her to intentionally cause the accident.

In support of this position, defendant points to his May 9 testimony that Karen at one point pressed her foot on the accelerator. However, a full reading of that testimony discloses that the incident in question did not occur at the time of the accident, for on the same page of the transcript defendant admits that he remembers none of the events leading up to the accident. It is true, as the court says, that Karen had a record of mental unbalance, including several suicide attempts. But to attribute the accident to this without any evidence whatever would be the sheerest conjecture. It would be, in fact, an improbable attribution, for, with defendant in the car, such an attribution would be to suppose her not only suicidal, but homicidal. Particularly in view of the proposition that whether a new trial should be granted on the basis of newly discovered evidence is within the sound discretion of the trial court, see State v. Ward, 225 Minn. 208, 30 N. W. (2d) 349, it certainly cannot be said that the trial court erred in failing to order a new trial.

Affirmed.