STATE of Minnesota, Respondent,

v.

Mohammed Gazizamil AL–
NASEER, Appellant.

No. A03–634.

Court of Appeals of Minnesota.

April 27, 2004.

Mike Hatch, Attorney General, Thomas R. Ragatz, Amy V. Kvalseth, Assistant Attorneys General, St. Paul, MN and Lisa Borgen, Clay County Attorney, Kenneth Kohler, Assistant Clay County Attorney, Moorhead, MN, for respondent.

John M. Stuart, State Public Defender, Rochelle R. Winn, Assistant State Public Defender, Minneapolis, MN, for appellant.

Considered and decided by SHUMAKER, Presiding Judge; KALITOWSKI, Judge; and MINGE, Judge.

## OPINION

GORDON W. SHUMAKER, Judge.

On this appeal from a conviction for criminal vehicular homicide, appellant argues that (1) admission of a videotaped statement violated his constitutional rights because he invoked his right to remain silent and made unequivocal requests for an attorney; (2) the district court erred in admitting emotional "spark-of-life" evidence and in denying a motion for a mistrial after the prosecutor questioned the victim's widow on her preclusion from attending the rest of the trial because of a sequestration order; (3) the district court erred in responding to jury questions during deliberations by stating appellant did not have to be aware of hitting the victim or have to cause the collision to be found guilty; (4) the district court erred in refusing to instruct the jury on the lesser-included offense of careless driving; (5) he did not receive effective assistance of counsel; and (6) the district court erred when it sentenced him on both counts for a single behavioral incident.

## FACTS

In June 2002, appellant Mohammed Gazizamil Al–Naseer was driving his car home to Fargo, North Dakota from Cass Lake. He swerved onto the side of the road and struck and killed Kane Thomson (Thomson), who was changing a tire. Ten miles down the highway, appellant realized that his headlights were not working properly. Because he was only eight miles from home, he decided to drive slowly with his hazard lights on. But a short time later, he stopped to try to repair the headlights. Two police officers, who had been dispatched to locate a car involved in a hit-and-run accident, stopped when they saw appellant. One of the officers noticed fresh damage to appellant's car and asked appellant if he hit something about ten miles back. Appellant is Iraqi and speaks very little English, but he told the officers that he might have hit something. The officers arrested appellant and took him to the Moorhead Law Enforcement Center, where Sergeant Daniel Prischmann video-

taped an interview with him. The relevant portions of the interview are as follows:

**DP:** [Y]ou have that right to remain silent. If you want an attorney prior to questioning or you have an attorney ...

**MA:** Why do I? Why would I need one? I can't say nothing.

**DP:** I'm just advising you of your rights.

**MA:** I'm not sure. Even my English is not very good.

**DP:** I understand that. If you couldn't afford an attorney one would be appointed for you by the courts.

. . . .

**MA:** Well, before I say something, why would I need somebody? Before I say something I need to make sure, and I can't say nothing, I need somebody here, because if you say attorney or whatever I say court and I don't know, I mean ... I stopped behind me and he saw me outside not inside of the car. I am not inside the car. I was outside the car.

**DP:** I understand that. Do you understand your rights?

. . . .

**MA:** I don't know. You say court, whatever, and I don't want to say nothing because I'm not sure. I'm honest with you, I don't know what is going on. Yes I'm tired. I'm not drunk, I never drink in my life ... I don't know ...

**DP:** Do you have an attorney?

**MA:** Well I don't know. Put yourself my place. This is first time and I don't know. I mean I don't know. I'm kind of at a loss. I am here and I don't know what is happening. My car is gone and I don't know what happened. So I mean I'm not sure. I'm not sure. Take your place my place. I don't know.

**DP:** I could give you a phone book and you could call one if you want to call one, and let you talk to one.

**MA:** Now? I don't see anyone. I mean. I don't know. Probably I can't afford an attorney. Well, I need somebody, whatever, county, court appoint me one ... we can try ... I tired ... I don't know. I don't know.

. . . .

**DP:** We can't make you give any statements against yourself. We can't make you say anything or tell us what you know without your consent.

. . . .

**MA:** Well, yeah I mean. I don't know. I'm lost. I am here. My car gone. I don't know what happen. And I stopped, nobody stop me. And the officer saw me outside, not inside the car. I don't know.

**DP:** Do you want to tell me what happened when you stopped? Can you tell me what you did or—

**MA:** Actually I was the driver and I'm tired. I feel something bump my car. I drive away a little bit. I feel no light. I went outside to check the light. I had no lights. I need to find out what is going on. So I do the lights. I hit it. I have lights. I thought that I would make it maybe. I not know so then I'll call my friend and see what has happened.

**DP:** If I understand, what you are telling me is, you say that you were very tired last night when you were driving?

**MA:** No. Today. I don't know. I don't know. If something happened I don't know.

Sergeant Prischmann continued to question appellant for another 50 minutes. The videotape shows that appellant was very unsure as to why he was there and why Sergeant Prischmann was questioning him. The videotape also shows that because of the language barrier, appellant is difficult to understand, and doesn't always

understand what Sergeant Prischmann is saying to him. At one point, he seems to think he is being questioned because he did not have lights: "I need to go to court because I'm suppose to go to the gas station but I cannot go because I, don't have lights."

After Sergeant Prischmann asked appellant several questions about the problems appellant was experiencing with his car, he asked, "Do you recall hitting anything along the way? I think you told the officer you hit something a while before you pulled over. Do you recall hitting anything?" Appellant responded, "No. I don't know."

The state charged appellant with two counts of criminal vehicular homicide for causing the accident through gross negligence and leaving the scene of an accident. Before trial, appellant stipulated that he was driving the vehicle that hit Thomson. An interpreter was appointed to assist him when needed during the trial.

Appellant moved to suppress the videotaped interview, arguing that Sergeant Prischmann obtained the statement after appellant invoked his right to counsel. The district court denied the motion because appellant "simply never paused in his attempt to explain his story to Sergeant Prischmann, even while referring to his need for counsel," and he did not request to terminate the interrogation until his counsel was present.

At trial, the state showed the jury the entire videotaped interview. In addition, appellant testified that he didn't understand English very well and was confused during that interview. Appellant also testified that he was tired the night of the accident but did not recall having the accident and that it took him several days to believe that he hit Thomson. He stated that if he had known that he hit something he would have stopped.

Dustin Leingang, who was with Thomson on the night of the accident, testified that when Thomson's car got a flat tire, they pulled to the shoulder, put the hazard lights on, and used the light of the trunk and a small flashlight to see what they were doing. Leingang testified that there was enough room between the fog line and the ditch for the car, the removed tire, and Thomson, who weighed 250 pounds and was 6 feet 3 inches tall. Leingang held the flashlight as Thomson crouched down to change the tire. Leingang testified that when the accident occurred he was spun around as if being pushed. He then saw Thomson's body several feet in front of the car and saw a car's taillights, but no brake lights, and heard no acceleration.

The police officers, who arrived shortly after the accident, also testified. They described the scene and debris matching appellant's car. One of the officers also testified to finding appellant on the side of the road. He testified that appellant initially stated that he must have hit something but did not know what, and later became unclear as to what occurred.

An accident reconstructionist theorized that appellant's car made a gradual arc until his car crossed about a foot over the fog line and hit Thomson while he was crouched down changing the tire. He also theorized that, given Thomson's position, appellant would not have seen Thomson when he hit him, would not have seen him in the rearview mirror after the impact, and would not have been able to notice the damage to the front passenger side of his car without getting out of his car.

Thomson's wife (Ms. Thomson) testified about her life with Thomson and read a poem Thomson had written. Over appellant's objection, she also presented three photos to the jury—of Thomson and his father; of the Thomsons on their honey-

moon; and of the Thomsons and their family on Thomsons' wedding day, six months before the accident.

Ms. Thomson stated that, based upon the motion to sequester, she would be testifying and could not attend the entire trial. Appellant moved for a mistrial based on the state's comments regarding Ms. Thomson's absence from much of the trial, her reading of the poem, and her testimony regarding Thomson's life. The district court denied the motion and gave a corrective instruction on the sequestration. Defense counsel requested that the district court submit the lesser-included offense of careless driving on the gross-negligence charge. The district court denied this motion.

During jury deliberations, the jury sent three written questions to the judge regarding the knowledge requirement of the leaving-the-scene charge. The court answered that "there's no specific intent required." When appellant asked about general intent, the district court responded, "I'm not going to get into that. You can argue that on appeal." Appellant objected, stating that for someone to remain at the scene of an accident it was inherently necessary that there be an element of knowledge that there had been an accident.

The jury convicted appellant of both criminal vehicular homicide involving gross negligence and criminal vehicular homicide involving a fatality and leaving the scene of an accident. Appellant was sentenced under the first count to 48 months in prison and ordered to pay a fine and restitution. This direct appeal followed.

## ISSUES

1. Was it a violation of appellant's state and federal constitutional rights for the district court to admit the videotaped statement appellant made to Sergeant Prischmann? Did appellant (a) invoke his right to counsel; (b) invoke his right to remain silent; or (c) make a knowing, voluntary, and intelligent waiver of his constitutional rights?

2. Was appellant denied his right to a fair trial where the state introduced "spark-of-life" evidence from the victim's wife?

3. Did the district court err as a matter of law in its interpretation of the statute on leaving the scene of a vehicular homicide, and instructing the jury that knowledge and causation were not elements of the offense?

4. Did the district court err when it refused to instruct the jury on the lesser-included offense of careless driving?

5. Did appellant receive effective assistance of counsel at trial?

6. Did the district court err when it sentenced appellant on both counts when there was only a single victim from a single behavioral incident?

## ANALYSIS

### I

 This court will uphold a district court's factual findings, including whether an accused invoked his constitutional right to counsel or his right to remain silent, unless the district court's findings are clearly erroneous. *State v. Hannon,* 636 N.W.2d 796, 804 (Minn.2001). "However, we make an independent determination, on the basis of the facts as found, of whether the state has shown by a fair preponderance of the evidence that the suspect's waiver [of his constitutional rights] was knowing, intelligent, and voluntary." *Id.* at 806.

*Right to Counsel*

 Under the United States Constitution and the Minnesota Constitution, an accused must be informed of his right to counsel prior to a custodial police interrogation. *Miranda v. Arizona,* 384 U.S. 436, 471, 86 S.Ct. 1602, 1626, 16 L.Ed.2d 694 (1966); *State v. Munson,* 594 N.W.2d 128, 138 (Minn.1999).

To ensure the sanctity of this protection, the U.S. Supreme Court has promulgated a bright-line, prophylactic rule that "an accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police."

*Munson,* 594 N.W.2d at 138 (quoting *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981)). An *Edwards* analysis requires that the court must first determine whether the suspect invoked his right to counsel during a custodial interrogation. *Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 493, 83 L.Ed.2d 488 (1984). Once it has been shown that a suspect successfully invoked his right to counsel, "courts may admit [the suspect's] responses to further questioning only on finding that [the suspect] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right [the suspect] invoked." *Id.; Munson,* 594 N.W.2d at 139; *State v. Warndahl,* 436 N.W.2d 770, 775 (Minn. 1989).

*Invoking Right to Counsel*

 In applying the *Edwards* rule, the U.S. Supreme Court has stated that custodial interrogation must cease only if a suspect's invocation of his right to counsel is clear and unequivocal. *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). The determination of whether a suspect invoked his right to counsel is an objective inquiry. *Id.* at 452, 114 S.Ct. at 2352. Thus, to trigger *Edwards,* a suspect must articulate his desire to have counsel present in a sufficiently clear manner such that a reasonable police officer, in similar circumstances, would understand the statement to be a request for an attorney.

In *Hannon,* during a custodial interrogation, defendant asked, "Can I have a drink of water and then lock me up—I think we really should have an attorney." *Hannon,* 636 N.W.2d at 800. The Minnesota Supreme Court found that this was sufficiently clear and that a reasonable police officer under the same circumstances would have understood the statement as a request for an attorney, and thus was unequivocal. *Id.* at 805. In making this determination the court considered the fact that the detective reacted to the statement by responding that if defendant wanted to talk to an attorney, the detectives would have to stop talking with him. *Id.* at 804.

 In determining whether a defendant's request for an attorney is clear and unequivocal, the police, and the courts, must consider a defendant's language limitations. Although the police do not have to treat vague, equivocal, or incomprehensible responses as requests for counsel, there are no talismanic words that a defendant must utter or risk the loss of an opportunity to consult a lawyer. Here, appellant did not say, "I want to speak with a lawyer." But it was reasonably apparent that he did not fully comprehend his right to remain silent or his right to consult with an attorney without cost to him. And throughout the relatively extensive discussion about lawyers, appellant said that he was not sure but that he

needed "somebody" here, that he did not want to say anything because he was not sure, and that he thought maybe the court should appoint an attorney.

This conversation and the many references to questions about having an attorney present might be viewed differently if appellant were a person of ordinary intelligence who was fluent in English. Perhaps we would conclude that such a person had not made the requisite clear· and unequivocal request for counsel. Our reading of appellant's responses leads us to conclude that he made a sufficient request to require the interrogation to cease.

*Initiating Further Discussion*

■ "If an accused asserts his right to counsel, interrogation must cease unless *the accused* initiates further communication, exchanges, or conversations with the police and *validly* waives his earlier request for the assistance of counsel." *Id.* (emphasis added).

In *State v. Risk*, the police told appellant he could call his attorney at "any time." 598 N.W.2d 642, 645 (Minn.1999). The appellant in *Risk* was not concerned with ending the interview, but instead with finding out if he could be released on bail that evening. *Id.* at 649–50. Appellant stated, "I wanna call my lawyer." *Id.* at 646. The police replied, "That's fine," adding, "[I]f you don't wanna talk to us, you don't have to." *Id.* Appellant then made his intentions clear, stating "I do wanna talk to you but … I don't wanna stay in [. . .] jail." *Id.* The court found that this exchange demonstrated that appellant was simply talking about calling his attorney after the interview to see if he could obtain a release on bail and was not trying to stop the interrogation. *Id.* at 649–50.

■ Here, the district court admitted appellant's statement to Sergeant Prischmann because it found that appellant "sim-ply never paused in his attempt to explain his story to Sergeant Prischmann, even while referring to his need for counsel." The videotape shows that appellant interrupted Sergeant Prischmann to state that he doesn't know, doesn't want to say anything, and that he was outside of the car when the police arrived. But it is important to note that this was not a case, as in *Risk*, where appellant made it clear that he wanted to continue talking to the police. Here, at no time did appellant say that he wanted to continue talking to Sergeant Prischmann. Instead, it was Sergeant Prischmann who initiated further questioning by asking whether appellant wanted to tell him what had happened after appellant repeatedly expressed confusion about why he was talking to the police at all. Thus, appellant did not initiate further communication with Sergeant Prischmann.

■ To further protect an accused's right against compelled self-incrimination under the Minnesota Constitution,

police are required to cease questioning an accused once he or she has made an ambiguous or equivocal statement that could reasonably be construed as an invocation of the accused's right to counsel, except for narrow questions designed to clarify the accused true desires regarding counsel. Only if the narrow clarifying questions asked by the police confirm that the accused is not expressing a desire to deal with the police only through counsel may the police resume the custodial interrogation.

*Id.* at 648–49.

Sergeant Prischmann explained that he could not make appellant give a statement against himself without appellant's permission. Appellant responded, "Well, yeah. I don't know. I am here. My car gone. I don't know what happened. I stopped. Nobody stopped me. Even the officer saw me outside. Not inside the car. I don't

know." Sergeant Prischmann did not clarify whether this meant that appellant wanted to continue the discussion. Rather, Sergeant Prischmann responded, "Do you want to tell me what happened when you stopped? Can you tell me what you did?" Sergeant Prischmann's comments were not narrow clarifying questions to confirm that appellant was expressing a desire to deal with the police without counsel present, and therefore do not satisfy the "clarifying question" test.

*Valid Waiver*

 Whether a suspect voluntarily waived his constitutional rights is determined by examining the totality of the circumstances. *State v. Pilcher,* 472 N.W.2d 327, 333 (Minn.1991). Despite this inquiry, the standard of review remains whether the district court's finding is clearly erroneous. *State v. Camacho,* 561 N.W.2d 160, 168–69 (Minn.1997). We independently review whether the state established by a preponderance of the evidence that a defendant validly waived his or her constitutional rights. *State v. Williams,* 535 N.W.2d 277, 286 (Minn. 1995).

 Under the totality-of-the-circumstances test, the court considers factors such as age, maturity, intelligence, education, experience, ability to comprehend, familiarity with the criminal-justice system, physical and mental condition, and language barriers. *Camacho,* 561 N.W.2d at 168.

In *State v. Marin,* although the officers realized that Marin, a native of Mexico, had difficulty speaking and understanding English, they did not use a staff interpreter. 541 N.W.2d 370, 373–74 (Minn.App. 1996), *review denied* (Minn. Mar. 27, 1996). Marin eventually waived his rights, although he stated several times that he did not understand them. *Id.* at 373. In *Marin,*

[w]hen first asked if he understood his right to remain silent, Marin responded, "A little bit." The officer again stated, "You do have the right to remain silent," and Marin replied, "I don't understand you." The other officer then told Marin that he did not have to talk to them. This time, Marin said, "Me, I want—I want to tell the truth." He responded, "okay," when the officer asked if he understood he could say he did not want to talk to them and then stated he understood. When further asked if he understood that everything he said could be used against him, Marin replied, "Yeah, I—everything what I told you." One officer also informed Marin he had the right to a lawyer. Marin simply responded, "Wait, I don't need a lawyer so I—I don't know—." When again asked if he understood his rights, Marin said, "No"; he did not understand if he needed a lawyer. Marin then acknowledged understanding his right to have one appointed. The next time an officer asked if he understood his rights, Marin replied, "Yeah."

. . . .

At another point, Marin stated he did not understand when an officer wanted to know [the victim's] last name. The officer simply continued questioning Marin about the events rather than repeat his question. Marin also said he did not speak English very well. Later, one officer asked if he wore a condom during the assault. Marin replied, "No. * * * But I mean you know I work real hard to, I don't drink, I don't smoke, I don't drugs."

*Id.* at 372–73. Because of the language barrier, and Marin's inability to understand the legal system, this court held that Marin did not voluntarily, knowingly, and intelligently waive his constitutional rights. *Id.* at 374.

Here, the videotaped interview is very similar to the interview in *Marin*. The videotape shows that appellant had difficulty understanding English. He says that his English is "not very good." He repeatedly states that he does not understand. He asks for clarification several times, and struggles with pronunciation. Here, as in *Marin*, appellant's language barrier is a strong factor in favor of finding that he did not voluntarily, knowingly, and intelligently waive his constitutional rights. In addition, the record shows that appellant has no prior convictions, and he stated that he was unfamiliar with the criminal-justice system. Thus, under the totality of the circumstances, we conclude that appellant did not voluntarily, knowingly, and intelligently waive his constitutional rights.

## Right to Remain Silent

When an accused suspect invokes the right to remain silent, "in any manner," custodial interrogation must cease. *Miranda,* 384 U.S. at 473–74, 86 S.Ct. at 1627. The analysis pertaining to appellant's right to remain silent is very similar to the analysis pertaining to appellant's right to counsel. More protection is afforded the right to counsel, however, in that there is the further measure of requiring the police to ask clarifying questions regarding a suspect's desire to proceed with or without counsel. *Williams,* 535 N.W.2d at 284–85.

Again, the videotape shows that appellant repeatedly stated, "I can't say nothing" and "I don't want to say nothing because I'm not sure." This is an unambiguous and unequivocal invocation of the right to remain silent.

Thus, under the totality of the circumstances, appellant did not voluntarily, knowingly, and intelligently waive his constitutional right to remain silent. The dis-

trict court erred in admitting the videotape and did not show by a fair preponderance of the evidence that appellant's waiver was intelligently, knowingly, and voluntarily waived.

In addition, we note that although appellant did not raise this issue, under Minn. Stat. § 611.32, subd. 2 (2000), law enforcement officials must provide an interpreter before interrogating or taking a statement from a person handicapped in communication. A person is "handicapped in communication" if he or she cannot understand legal proceedings because of difficulty speaking or comprehending English. Minn.Stat. § 611.31 (2000). Clearly, this is a situation where having an interpreter would have facilitated better understanding and communication between appellant and his interviewer.

## Harmless Error

Even though the district court erred in admitting the videotape, appellant's conviction will stand if the error was harmless beyond a reasonable doubt. *State v. Robinson,* 427 N.W.2d 217, 224 (Minn.1988). This court conducts a harmless-error analysis by independently evaluating the evidence to determine whether the jury's verdict would have been different if the district court had excluded the statement. *Id.* If the evidence is overwhelming even without the statement and the statement would not have significantly contributed to the jury's verdict, the error was harmless. *Id.*

The jury's verdict was that appellant was guilty under the following statute:

A person is guilty of criminal vehicular homicide resulting in death and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both, if the person causes the death of a human being not constituting murder or man-

slaughter as a result of operating a motor vehicle:

(1) in a grossly negligent manner;

. . . .

(7) where the driver who causes the accident leaves the scene of the accident in violation of section 169.09, subdivision 1 or 6.

Minn.Stat. § 609.21, subd. 1 (2000). Gross negligence in this context has been defined "as a very high degree of negligence. Unlike recklessness . . . gross negligence requires no conscious and intentional action which the actor knows, or should know, creates an unreasonable risk of harm to others. Negligence, even though extreme negligence, is all that is required"." *State v. Brehmer*, 281 Minn. 156, 161, 160 N.W.2d 669, 673 (1968). *See also State v. Boldra*, 292 Minn. 491, 492, 195 N.W.2d 578, 579 (1972) (finding gross negligence where defendant drove through stop sign); *State v. Kremer*, 262 Minn. 190, 192, 114 N.W.2d 88, 89 (1962) ("[w]hen the driver intends to proceed forward, or is negligent in any way, he can be held liable for his acts."); *State v. Pelawa*, 590 N.W.2d 142, 145 (Minn.App.1999) (finding gross negligence was shown by a "sufficient degree of inattention to the road")" *review denied* (Minn. Apr. 28, 1999); *State v. Hegstrom*, 543 N.W.2d 698, 703 (Minn. App.1996) ("[a] sufficient degree of inattention to the road could constitute a lack of 'slight care' that is gross negligence."), *review denied* (Minn. Apr. 16, 1996).

Appellant stipulated that his car was involved in the accident. He testified that he was tired the night of the accident. He testified that he does not remember hitting anything and didn't realize that his car was damaged until he got out to check his lights.

Appellant's own testimony, coupled with the testimony of the officers who arrived at the scene, the testimony of Leingang, who saw a car drive off without braking, and the testimony of the accident reconstructionist, show that appellant either fell asleep or was extremely inattentive at the wheel as to have not seen the victim's car on the side of the road and not felt the impact of hitting a 250–pound man.

The videotaped interview with Sergeant Prischmann did not contain any additional information except to show appellant's confusion about what had happened. Because the videotaped interview did not significantly add to the testimony at trial, any error the district court made in admitting it was harmless.

## II

Appellant argues that the district court abused its discretion by allowing testimony from Ms. Thomson regarding Thomson and her inability to attend the entire trial because of the sequestration. Appellant argues the evidence was an improper appeal to the sympathy, passion, and prejudice of the jury and that the evidence exceeded the permissible limits established by caselaw on "spark-of-life evidence." We disagree.

In general, rulings on evidentiary matters are within the discretion of the district court. *State v. Amos*, 658 N.W.2d 201, 203 (Minn.2003). If the district court abuses its discretion, this court must determine whether, had the evidence been admitted, the jury would have reached the same verdict beyond a reasonable doubt. *State v. Post*, 512 N.W.2d 99, 102 (Minn.1994).

The state argues that appellant's failure to object to Ms. Thomson's testimony regarding Thomson and her testimony regarding sequestration precludes appeal on these issues. Failure to object to the admission of evidence generally con-

stitutes waiver of the right to appeal on that basis. *State v. Vick,* 632 N.W.2d 676, 684–85 (Minn.2001). An appellate court may consider a waived issue, however, if there is (1) error, (2) that is plain, and (3) the error affects the defendant's substantial rights. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). To satisfy the third prong, a defendant bears a heavy burden of persuasion to show that "the error was prejudicial and affected the outcome of the case." *Id.* at 741. In *State v. Pilot,* 595 N.W.2d 511, 517–18 (Minn.1999), the supreme court stated, "[T]he trial error must have been so clear under applicable law at the time of conviction, and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object—and thereby present the trial court with an opportunity to avoid prejudice—should not forfeit his right to a remedy." *Id.* at 518 (quoting *Rairdon v. State,* 557 N.W.2d 318, 323 (Minn.1996)). If these three prongs are met, the court must then decide whether it should address the issue in order to "ensure fairness and the integrity of judicial proceedings." *Griller,* 583 N.W.2d. at 742. Only after all these factors are satisfied may an appellate court exercise its discretion to correct an unobjected-to error. *Id.*

■ Here, the claimed error involves admission of Ms. Thomson's testimony regarding her husband and her testimony regarding the sequestration. Appellant states that the "spark-of-life evidence" was excessive. Evidence concerning the life of a homicide victim is relevant and admissible to show the victim as a human being. *See generally State v. Carney,* 649 N.W.2d 455, 463 (Minn.2002) (holding photograph showing victim with his family photograph fell within the prosecutors latitude in showing victim and was not unduly prejudicial); *State v. Buggs,* 581 N.W.2d 329, 342 (Minn.1998) (holding that prosecutor's attempt to present murder victim as a thoughtful, friendly, hard-working individual and the mother of a four-year-old child, or showing victim's picture before and after her death did not go beyond the pale of giving the victim a "spark of life" nor was its matter-of-fact nature likely to inflame the jury's passions); *State v. Hodgson,* 512 N.W.2d 95, 98 (Minn.1994) (holding that 45–second video of the victim playing basketball during the emotional testimony of victim's mother did not have potential for creating undue prejudice and arousing emotions of jurors that outweighed the probative value of the evidence); *State v. Graham,* 371 N.W.2d 204, 207 (Minn.1985) (holding that even though victim's personal life was not strictly relevant to issue of who murdered him, the prosecution had some leeway to show the victim was imbued with "spark of life" and to present the victim as a human being).

■ In comparing Ms. Thomson's testimony to "spark-of-life" testimony found acceptable in other cases, we conclude that her testimony is not inappropriately emotional or inflammatory. There was no plain error here, and appellant has not met his heavy burden of persuasion to show that the error was prejudicial and affected the outcome of the case.

■ The same can be said for the testimony on Ms. Thomson's inability to attend the whole trial because she was sequestered. It seems reasonable that the jury would want to know why she was not there for the duration of the trial. Even if this testimony was prejudicial, the district court gave a corrective instruction to the jury that adequately explained the sequestration process.

■ Appellant also argues that the three photographs Ms. Thomson presented during her testimony were inadmissible "spark-of-life" evidence. Photographs of a

homicide victim that show aspects of the victim's life are admissible, provided they are not too inflammatory or prejudicial. *Carney*, 649 N.W.2d at 463. The photos here were of Thomson and his father, Thomson and his wife on their honeymoon, and the Thomsons' wedding picture. These photos are not overly prejudicial or inflammatory and fit within acceptable "spark-of-life" evidence under the caselaw. Thus, the district court did not abuse its discretion in admitting the photographs over appellant's objection.

## III

■ Appellant argues that the district court erred as a matter of law when it interpreted Minnesota's statute on leaving the scene of a vehicular homicide as a strict liability crime and instructed the jury that knowledge and causation were not elements of the offense. We agree. Statutory construction is subject to de novo review. *State v. Loge*, 608 N.W.2d 152, 155 (Minn.2000). Jury instructions are reviewed under an abuse-of-discretion standard. *State v. Peou*, 579 N.W.2d 471, 475 (Minn.1998).

■ "[A] criminal state of mind, or a criminal intent, is a necessary element of any crime having its origin in common law." *In re Welfare of C.R.M.*, 611 N.W.2d 802, 808 (Minn.2000) (quoting *State v. Orsello*, 554 N.W.2d 70, 72 (Minn. 1996)). If the legislature chooses not to include an intent requirement in a statutory crime originating in the common law, one is implied as a matter of law. *Id.* at 808; *State v. Charlton*, 338 N.W.2d 26, 30 (Minn.1983).

■ The United States Supreme Court has noted that statutes "concerning 'public welfare' or 'regulatory offenses,' which typically 'regulate potentially harmful or injurious items,' are not subject to a presumption requiring proof of a mens rea to establish liability." *C.R.M.*, 611 N.W.2d at 805. Legislative intent to impose strict criminal liability must be clear. *Id.*

In *Staples v. U.S.*, the United States Supreme Court stated, the "penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with *mens rea.*" 511 U.S. 600, 616, 114 S.Ct. 1793, 1802, 128 L.Ed.2d 608 (1994). When the punishment imposed is only a light penalty "such as fines or short jail sentences," the Supreme Court has "construed [such] statutes to dispense with *mens rea.*" *Id.* at 616–18, 114 S.Ct. at 1802–03.

■ Because strict liability offenses are disfavored, an appellate court will determine that the legislature intended to create a strict-liability crime only after a careful and close examination of the statutory language. *State v. Arkell*, 672 N.W.2d 564, 568 (Minn.2003). The statute at issue here states:

A person is guilty of criminal vehicular homicide resulting in death and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both, if the person causes the death of a human being not constituting murder or manslaughter as a result of operating a motor vehicle:

(1) in a grossly negligent manner;

. . . .

(7) where the driver who causes the accident leaves the scene of the accident in violation of section 169.09, subdivision 1 or 6.

Minn.Stat. § 609.21, subd. 1. Section 169.09, subds. 1, 6, states:

**Subdivision 1. Driver to stop for accident with person.** The driver of any vehicle involved in an accident re-

sulting in immediately demonstrable bodily injury to or death of any person shall immediately stop the vehicle at the scene of the accident, or as close to the scene as possible, but shall then return to and in every event, shall remain at, the scene of the accident until the driver has fulfilled the requirements of this chapter as to the giving of information. The stop shall be made without unnecessarily obstructing traffic.

. . . .

**Subd. 6. Notify police of personal injury.** The driver of a vehicle involved in an accident resulting in bodily injury to or death of any person shall, after compliance with the provisions of this section, by the quickest means of communication, give notice of the accident to the local police department, if the accident occurs within a municipality, or to a state patrol officer if the accident occurs on a trunk highway, or to the office of the sheriff of the county.

Here, the district court gave the following jury instruction:

The second charge against the defendant is also a charge that is known as criminal vehicular homicide, but this comes under the law of Minnesota that provides that whoever—or if a driver of a motor vehicle who causes an accident resulting in the death of any person and does not stop and remain at the scene of the accident is guilty of a crime.

So the elements of that charge of criminal vehicular homicide are:

First, that the death of Kane Thomson occurred as a result of an accident. And that is a fact that is stipulated to or agreed upon. So that's not in dispute.

Second, the defendant failed to stop the vehicle at the scene of the accident or as close as possible to the scene.

The third element is that the defendant's driving caused the accident. That

also is not in dispute. And a fourth element is that the defendant's act took place on about June 16th, 2002, here in Clay County, Minnesota.

The court corrected the misstatement that appellant's driving caused the accident and re-instructed the jury that the stipulation was that appellant's car caused the accident.

The record shows that the jury had several questions after receiving the instructions. The first was, "Did the defendant have to be aware that something happened in order to be guilty of charge 2?" The court answered, "No" and stated, "There's no specific intent required." When appellant asked about general intent, the court responded, "I'm not going to get into that. You can argue that on appeal." Appellant objected. Later the jury rephrased the question:

Does a person need to be aware that he had been in an accident to be guilty of charge No. 2. Because if a person doesn't know, why should or would they stop right away, especially within a short [distance] of town. If you awoke and found yourself to be short on lighting and could see town under three miles away or less, wouldn't [you go] there to check out your lighting situation under lights.

The court again responded in the negative, and appellant objected. The jury then asked a third question about the third element of charge No. 2 and whether it referred to "defendant's manner of driving, or that he was the one operating the vehicle?" Counsel noted that the third element states, "the defendant's driving caused the accident," and stated as to element No. 3, "Ask yourselves the question: 'Did the defendant cause the accident?'"

Because a violation of section 609.21, subd. 1(7), is a felony-level offense,

the policy disfavoring strict-liability statutes is implicated. The legislature has not clearly indicated its intent to dispense with a *mens rea* requirement, and the district court should have implied a knowledge requirement as a matter of law. It was an abuse of discretion for the district court not to do so in instructing the jury. Thus, we vacate appellant's conviction of criminal vehicular homicide—leaving the scene of a vehicular homicide.

## IV

■ Appellant argues that the district court erred in refusing to give his requested instruction on the lesser-included offense of careless driving. Jury instructions are subject to an abuse of discretion standard. *Peou,* 579 N.W.2d at 475. A judge's decision not to submit a lesser-included offense to the jury is subject to an abuse of discretion standard. *State v. Dukes,* 544 N.W.2d 13, 20 (Minn.1996).

Appellant was charged under the following statute:

A person is guilty of criminal vehicular homicide resulting in death and may be sentenced to imprisonment for not more than ten years or to payment of a fine of not more than $20,000, or both, if the person causes the death of a human being not constituting murder or manslaughter as a result of operating a motor vehicle:

(1) in a grossly negligent manner;

. . . .

(7) where the driver who causes the accident leaves the scene of the accident in violation of section 169.09, subdivision 1 or 6.

Minn.Stat. § 609.21, subd. 1. The statute for careless driving states:

Any person who operates or halts any vehicle upon any street or highway carelessly or heedlessly in disregard of the

rights of others, or in a manner that endangers or is likely to endanger any property or any person, including the driver or passengers of the vehicle, is guilty of a misdemeanor.

■ Minn.Stat. § 169.13, subd. 2 (2002).

Our case law on lesser-included offenses mandates that the trial court instruct the jury on the requested offense if the defendant establishes three things: the lesser offense is included in the higher charge, the evidence provides a rational basis for acquitting the defendant of the offense charged, and the evidence provides a rational basis for convicting the defendant on the lesser-included offense.

*Stiles v. State,* 664 N.W.2d 315, 319 (Minn. 2003). In *Pelawa,* this court found that the district court did not abuse its discretion by denying an instruction on careless driving where the victims died as a result of the accident. *Pelawa,* 590 N.W.2d at 148. The court stated that

there is no rational basis for a jury to have found that appellant drove in disregard of his victims' rights or in a manner that endangered them, but did not drive in a grossly negligent manner that killed them, because the victims were not only endangered but killed by appellant's driving.

*Id.*

■ The parties agree that careless driving is a lesser-included offense of Minn.Stat. § 609.21 subd. 1(1). Thus, the first prong is satisfied. But here, as in *Pelawa,* because Thomson was not just endangered but died as a result of the accident, the district court was not required to give an instruction on the lesser-included offense of careless driving. Thus, the district court did not abuse its discretion in denying appellant's request for an instruction on careless driving.

## V

In his pro se supplemental brief, appellant argues that he received ineffective assistance of counsel. Appellant seems to argue that his representation fell below a reasonable standard because trial counsel (1) did not communicate with appellant prior to trial, (2) advised appellant to stipulate that he was the driver of the car that killed Thomson, and that the state may have struck a potential juror based on a racial issue.

The Minnesota Supreme Court has repeatedly stated that an appeal from a judgment of conviction is not the most appropriate way of raising an issue concerning the effectiveness of the trial counsel's representation because the reviewing court does not have the benefit of all the facts concerning defense counsel's representation. *See, e.g., State v. Zernechel,* 304 N.W.2d 365, 367 (Minn.1981); *State v. Grover,* 402 N.W.2d 163, 167 (Minn.App. 1987). This issue is more effectively presented in a postconviction proceeding. *See, e.g., Voorhees v. State,* 627 N.W.2d 642, 649 (Minn.2001) ("a postconviction hearing is necessary only when the record is not sufficient to allow proper review of the ineffective assistance of trial counsel claim."); *State v. Wenberg,* 357 N.W.2d 355, 356 (Minn.App.1984), *review denied* (Minn. Feb. 6, 1985).

The record is insufficient to allow our proper review appellant's ineffective assistance of counsel claim. This holding does not preclude appellant from bringing a postconviction petition raising this issue.

## VI

Appellant argues that under Minn.Stat. § 609.035 (2000) the state cannot sentence him on both counts when there was only a single victim and the conviction was the result of a single behavioral incident. Here, appellant was only sentenced under Minn.Stat. § 609.21, subd. 1(1), for driving his vehicle in a grossly negligent manner. Nothing in the record indicates that appellant was sentenced under Minn.Stat. § 609.21, subd. 1(7). In addition, we vacate appellant's conviction of gross negligence—leaving the scene of a vehicular homicide, based on improper responses to the jury's questions regarding the knowledge requirement of that offense. Thus, appellant's claim is without merit.

## DECISION

Because the district court's error in admitting appellant's police interrogation statements was harmless and because the court did not err in its evidentiary rulings, its refusal to instruct on a lesser-included offense, and its sentence, we affirm on those issues. But because the court erred as a matter of law by submitting as a strict liability crime the offense of leaving the scene of a vehicular homicide, we reverse the judgment of conviction as to that crime. We do not address appellant's ineffective assistance of counsel claim.

**Affirmed in part and reversed in part.**